Pee Cueiam:
This case was referred to Trial Commissioner Saul Richard Gamer, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on February 9,1965. Plaintiff has excepted to the opinion and certain of the findings of fact. Defendant has elected to submit the case on the commissioner’s report and opinion without exceptions and brief pursuant to Rule 62 (b), and the case has been submitted to the court on oral argument of counsel. Since the court is in agreement with the opinion, *353 findings and recommendation of the commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is, therefore, entitled to recover in accordance with the opinion of the court of October 11, 1963, and judgment is entered to that effect with the amount of recovery to be determined in accordance with Rule 47(c) (2).
Opinion of Commissioner
Gamer, Commissioner: This suit for back pay by a former nonveteran civilian employee of the Air Force at the Headquarters of the Sixteenth Air Force near Madrid, Spain, is grounded on an alleged arbitrary and capricious discharge during plaintiff’s probationary period.
Defendant filed a motion for summary judgment which was based on the contention that there was no procedural irregularity, that the court should not, therefore, concern itself with the merits of the inefficiency charges served upon plaintiff, and that the arbitrary and capricious allegations were insufficiently supported to warrant a trial on that issue. On October 11,1963, the court, although essentially agreeing with defendant’s position on the procedural question, nevertheless overruled defendant’s motion. After considering various applicable procedural regulations, the court held that, while under a proper interpretation of one regulation plaintiff should have been retained on the payroll one day longer, that defect was not of such character as to invalidate the discharge. However, it further held that plaintiff had, by his pleadings and his papers opposing defendant’s motion, alleged enough, including asserted malice and personal prejudice, to warrant having his day in court on the arbitrary and capricious issue. It therefore returned the case to the commissioner for the holding of a trial.
After a careful review of the testimony, the rather voluminous exhibits, and plaintiff’s contentions as set forth in his requested findings and briefs, it must be concluded that plaintiff has failed to carry the heavy burden cast upon him of showing by “well-nigh irrefragable proof ” (Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp. 630, 631 (1954)) *354 that his discharge was motivated by personal malice or was in any other manner arbitrary or capricious.
The complaint against plaintiff was that his inefficiency in the performance of his duties was such as to disqualify him for the position for which he had been employed. Four instances of such alleged inefficiency were enumerated in the letter of charges which was served upon plaintiff. Reflecting as they do upon his technical proficiency, plaintiff understandingly strongly defends himself against these charges. Plaintiff was hired as a “law clerk-interpreter.” Two of the four charges were concerned with alleged inaccuracies in Spanish translation. The third charge involved plaintiff’s performance on a so-called “Country Law Study.” This project was designed to ascertain what procedural safeguards and rights the personnel of the American military stationed in Spain would be entitled to under the Spanish judicial system. This was plaintiff’s principal assignment and constituted the main purpose for which he had been employed in the first place. Such a study had been commenced and plaintiff’s primary task was to expand and complete it.
As to the translations, plaintiff has gone to considerable lengths to prove that his interpretations were correct. However, to disagree, as plaintiff’s supervisors did, does not necessarily mean that they were arbitrary or capricious. The proof demonstrates that they honestly and conscientiously arrived at the conclusion that plaintiff’s translations were erroneous, and that in so concluding they were in no way motivated by any personal malice. Once this is shown, the court’s function as reviewer ends, for it has been held innumerable times that it cannot involve itself in the merits of such controversies. For all the court knows, plaintiff may as a technical matter of translation have been right, and his supervisors wrong. As was previously stated in the former opinion in this case, however, and in the cases therein cited, questions such as those involving the satisfactory nature of an employee’s services are “discretionary matters necessarily entrusted to the responsible agency officials.” The court can “not substitute its judgment for the agency’s as to the employee’s qualifications.” Greenway v. United States, 163 Ct. *355 Cl. 72, 81 (1963). That plaintiff may have been more fluent and proficient in Spanish than were his supervisors does not automatically disqualify them from arriving at a reasoned opinion that, in the particular instances involved, his translations were erroneous. They also had available to them the advice of other respected Spanish nationals whom they did consult and whose translations and opinions they had every right to prefer. They did not arbitrarily leap to the conclusion, in complete ignorance, that plaintiff’s translation work was deficient. Just as, in personnel matters, a lawyer-employee may be judged by laymen, Spector v. United States, 165 Ct. Cl. 33 (1964), cert. denied, 379 U.S. 966 (1965), so may a translator be judged by those having less knowledge of the language involved.
With respect to the “Country Law Study,” the charge was that plaintiff’s “concept concerning the Spanish Government” made it impossible for plaintiff to perform the assignment and that in fact plaintiff had, since the commencement of his employment some two months earlier “submitted nothing showing any constructive effort to accomplish this job.” Here again the proof shows that these conclusions were not capriciously arrived at. For almost two months plaintiff had in fact submitted nothing. And inquiry as to the reason therefor revealed that plaintiff disagreed so strongly with the conclusions set forth in the draft previously prepared to the effect that our military personnel would have various basic rights protected before the Spanish criminal courts that he could not conscientiously proceed with that draft as the base. Despite various provisions of the Spanish Criminal Code and of a special Procedural Agreement (No. 16) entered into between high level military authorities of Spain and the United States, plaintiff seemingly felt that the various written provisions of both the Code and the Agreement were meaningless and that in actual practice the Spanish system was not such, insofar as a fair or impartial trial is concerned, as to afford any safeguards at all to the members of the United States Armed Forces.
Here again plaintiff in his defense, including his lengthy reply to the charges (71 pages not including exhibits), makes *356 a strong effort to prove that his concept of the Spanish judicial system and procedures is the correct one, and that he was therefore justified in refusing to do any further work on the partially completed study. But as to this matter too the court is precluded from becoming involved in the merits of the controversy. What the proof does make plain is that plaintiff’s supervisors honestly arrived at the conclusion that, considering plaintiff’s demonstrated basic attitudes, he was simply not the man the Command could rely on to make an objective, technical, legal study. Plaintiff was familiar with Procedural Agreement No. 16 entered into for the express purpose of providing our military personnel with specifically enumerated safeguards, he had been furnished a copy of the Agreement (as well as other materials) when he first reported for work, and the Staff Judge Advocate (plaintiff’s official supervisor who was authorized to and did effect plaintiff’s dismissal) was reasonably convinced that this document alone constituted a sufficient basis for study and analysis. He felt there was no justifiable reason for plaintiff to refuse to give this important agreement any serious weight. Eight or wrong, plaintiff’s supervisors in good faith, and on the basis of substantial considerations, concluded that plaintiff was disqualified from satisfactorily performing the principal task for which he was employed. There is no credible or substantial evidence of any malice or personal bias directed against plaintiff, nor is there any rational basis shown as to why there should have been any. Even plaintiff does not appear to deny that during the approximately two months of his employment he accomplished and submitted nothing on the Country Law Study and that there did not seem to be any prospect that he would submit anything in the foreseeable future if the Spanish Criminal Code and the Procedural Agreement as written were to be considered as the bases upon which he was to proceed. Manifestly an agency can take appropriate steps to correct such a situation.
Although, as plaintiff’s formal “supervisor” under plaintiff’s job description, it was the Staff Judge Advocate who issued the letter of charges and who made the final decision, and against whom, therefore, plaintiff’s charges of prejudice *357 and malice are principally directed, tbe proof nevertheless shows that actually the charges relating to the Country Law Study and the translations originated in and were grounded upon complaints first made to the Staff Judge Advocate by other officers in the Judge Advocate General’s Office who were also authorized to assign work to plaintiff and to review such work.
One excuse plaintiff offers for his failure to make any progress on the Country Law Study assignment is that the Headquarters did not have the necessary lawbooks and that his request that a list of books he prepared be purchased was not honored. However, plaintiff knew, or certainly should have known (and as his job description made explicit), that the Madrid Law Library, easily accessible to the Base, was available to him for research purposes. There is no showing that he ever sought permission to leave the Base to go to the law library and that such permission was ever refused, thus resulting in plaintiff’s being deprived of the proper tools with which to perform his assigned task. This excuse cannot be accepted.
The fourth charge involved alleged “misuse of judgment” in plaintiff’s handling of “a matter of simple legal assistance” for the Command’s Director of Operations. While neither the charge nor the evidence make wholly clear what specific duties plaintiff was supposed to perform in connection with the Director’s difficulty (a criminal charge arising out of a bite inflicted on a Spanish child by the Director’s dog), it does appear that plaintiff was asked to perform court duties in the nature of defense counsel for the Director. However, as his job description sheet makes plain, plaintiff was not employed as an attorney to appear in court to defend the Command’s personnel against criminal charges. As a law clerk-interpreter, he should not have been assigned such legal defense duties, and it would not therefore be proper to base a discharge on such a charge. If this were the sole basis of the discharge there would certainly be cause to set it aside. However, since no sufficient reason appears to void the other three charges, the nullification of the fourth charge is immaterial. Brownell v. United States, 164 Ct. Cl. 406 (1964); Engelhardt *358 v. United States, 125 Ct. Cl. 603 (1953). “* * * where the discharge is premised upon the reasons severally, each one being allegedly sufficient, the invalidity of one would be immaterial to the result, so long as the valid remainder was sufficient.” Deviny v. Campbell, 194 F. 2d 876, 879 (D.C. Cir. 1952), cert. denied, 344 U.S. 826.
Plaintiff further complains that the charges lack specificity. Certainly Charges 1 and 2 pertaining to plaintiff’s translations could well have been more specific. Charge 1 states that on a certain translation project “concerning Direct Contracts,” plaintiff’s “end product was so poorly accomplished that it was necessary for you to re-do the entire matter.” No details of any specific errors are, however, set forth. And Charge 2 referred to another “poor translation” on a second assignment relating to the imposition of “sobre-tasas” upon various telephone services. Again no specific details are set forth concerning alleged errors. Were plaintiff in fact ignorant of the basic nature of the complaints, these charges too would have to fall for plaintiff would then not fairly be able to defend himself. However, as his lengthy answer to the charges demonstrates, as well as his testimony in this court, plaintiff well knew what the nature of the complaints against him were on the two projects covered by these charges. Both assignments were clearly specified. The principal complaints against plaintiff on these assignments involved the correct translations of the Spanish phrase “Con-trato Directo”[1] in the first assignment and “sobretasas” [2] in the second. On both plaintiff has gone to considerable lengths to prove the correctness of his translations of these terms. If one is well aware of what he is being charged with, complaints as to ambiguity or lack of specificity will be rejected. Queen v. United States, 137 Ct. Cl. 167 (1956). As the court said in Baughman v. Green, 229 F. 2d, 33, 34 (D.C. Cir. 1956): “* * * though he complained of the vagueness of the charges, he clearly understood them and at great length en- *359 deavorecl to rebut them.” In any event, the result would be no different even if these two charges too were nullified. For the charges as to the Country Law Study, including the charge that “you submitted nothing,” is certainly specific enough and, indeed, not controverted. The sustaining of that charge alone, involving the principal purpose of plaintiff’s employment, would be sufficient.
Plaintiff argues that for still another reason must his discharge be considered to have been capriciously effected, i.e., he was not given the “full and fair tryout” called for by a pertinent Air Force Begulation.[3] As a new employee of only approximately eight weeks and therefore still in his one-year probationary period, plaintiff contends he was not properly indoctrinated, apprised and warned of his alleged deficiencies, or given suggestions as to how to improve his work, all as called for by the regulation.
However, the regulation does not prescribe any minimum period of time for the retention of probationary employees. On the other hand, it specifically states that “If after a full and fair tryout, it is apparent that an employee is unsuited for continued employment, he can be separated without undue formality at any time prior to the expiration of the probationary or trial period.” [Emphasis supplied.] The regulation must, in all its aspects, be rationally applied. For instance, plaintiff’s supervisors could hardly be expected to counsel plaintiff, or to give him suggestions, concerning how to be a better Spanish translator when they themselves either did not speak or understand Spanish or did not have the intense schooling in the language that plaintiff had. Plaintiff was hired precisely because he presumably was more expert than his supervisors in his knowledge of Spanish generally and Spanish legal terms in particular. Nor could they be expected to give him expert guidance with respect to his solidly formed basic attitudes and concepts of the Spanish judicial system and the Spanish laws, grounded in many years *360 of formal legal education in Spain, although the proof does show that he was warned that his employment could not be continued with such attitudes. Here, too, the very purpose of hiring plaintiff was his presumed superior knowledge in these fields. With the doctor’s degree in Spanish law which plaintiff claimed to have, he appeared to be peculiarly qualified for the task. But the fact that plaintiff knew more Spanish than his supervisors and had a better formal education in Spanish law did not, because of the indoctrination and guidance provisions of the regulation, forever estop their taking appropriate action to dispense with his services when they became honestly convinced that, despite his apparent technical qualifications, he was still not suited for the special task for which he was employed. Though they may have erred in their judgment, it was nevertheless a judgment fairly arrived at in what they felt was in the best interests of the service. And that this conclusion was arrived at within only two months of plaintiff’s commencement of work does not in and of itself indicate that it was capriciously formulated. Considering the facts and circumstances, there is no showing that this period of time was not sufficient to come to a reasoned decision in the matter.
Nor can plaintiff fairly contend that he was taken by surprise by his termination and given no previous indication or warning that his work was unsatisfactory, as required by the regulation. His allegedly faulty translations were fully discussed with him and the acceptance of the substituted translations explained. And his failure to submit any work on the “Country Law Study” was also discussed, as was the Staff Judge Advocate’s dissatisfaction with plaintiff’s attitude toward the entire assignment. This was certainly at least substantial compliance with the requirement of the regulation that “the performance, conduct, and general character traits of employees will be evaluated continually and discussed with employees frequently during their probationary or trial period.”
Further, the admitted ignorance of the Staff Judge Advocate or plaintiff’s other supervisors of even the existence of the “full and fair tryout” regulation does not preclude their *361 actions from nevertheless having been in substantial compliance therewith. "Where there is in fact such compliance with a regulation and its spirit fully lived up to, actual knowledge of its existence is obviously immaterial. One can be in compliance with an unknown regulation just as one can be a law-abiding citizen without carrying around in his head all the laws on the statute books.
Nor is it possible to sustain plaintiff’s further contention that his response to the charges was not given the consideration called for by the regulation, which provides: “The official to whom the reply is made will consider all facts presented by the employee and will determine whether the proposed action should stand or be modified.” [4] It is argued that plaintiff’s reply, not considering extensive exhibits, consisted of 71 single-spaced typewritten pages, and that it was submitted during the day on December 9, 1959, but that plaintiff received his final notice on December 11, 1959, less than two full days later. Plaintiff says it was not possible for a reply of such length and content to be given considerate attention during such a short period, and that it is evident, therefore, that the Staff Judge Advocate had prejudged the matter. The contention is buttressed by the fact that the Staff Judge Advocate, at first believing the old summary termination rule was still applicable to probationaries, erroneously ordered plaintiff’s dismissal peremptorily and without giving plaintiff the right to answer the charges. Plaintiff says this proves the Staff Judge Advocate’s mind had already been made up, and that the giving to plaintiff, by corrected procedure, of an opportunity to answer, and then seemingly giving “consideration” to the answer, simply amounted to going through the formalities.
However, the mere length of the reply does not automatically compel the conclusion that it was not adequately considered in the one- to two-day period the Staff Judge Advocate devoted to it. Furthermore, a mere perusal of the reply reveals that a good part of it does not actually constitute an answer to the charges as such, but instead is concerned *362 with other matters, including various forms of attacks upon plaintiff’s supervisors. This material could justifiably be quickly disregarded. The notice of final decision, stating that “Full and careful consideration has been given to your answer,” did actually discuss numerous statements made 'in plaintiff’s reply, thus clearly indicating consideration thereof. And the Staff Judge Advocate’s original error in summarily discharging plaintiff, which, on advice of the Personnel Section, he then erroneously thought was the proper procedure to be followed, does not serve to vitiate the subsequently corrected proceedings. Otherwise the error would, on the prejudgment theory, in effect permanently preclude plaintiff’s discharge, no matter how justified.
Even without such an original error, there can never be any absolute assurance that the reviewer of an answer to charges will give it the full consideration called for by the regulation. However, the presumption must always be that Government officials will faithfully perform their assigned duties. “Personnel disputes are hard to resolve. In undertaking to do so, we start out with the presumption that the official acted in good faith.” Knotts v. United States, supra, p. 492. Certainly in this instance and on this record this presumption is not rebutted.[5]
By its previous decision in this case, the court held that plaintiff is owed one day’s additional pay. That is the only recovery to which plaintiff is entitled. It is accordingly recommended that judgment be granted to such extent, the amount of the recovery to be determined pursuant to Buie 47 (c) (2) of the Buies of this court.
*363 Findings of Fact
1. In 1959, plaintiff, a United States citizen, was residing in Seville, Spain. He had been living in Spain since September 1952.
2. After having graduated from the University of Notre Dame in 1949, plaintiff attended the law school at the University of Seville, and took graduate courses in law at that university as well as the University of Salamanca. He obtained the Spanish equivalent of an LL. B. degree from the University of Seville in 1955, and an LL. M. from the University of Salamanca in 1957 in which year he also passed the Spanish Bar Examination. Although in 1958 plaintiff completed the required courses toward the Spanish equivalent of a doctor’s degree in law at the University of Seville, his thesis was not accepted and the degree not awarded until 1961. While it appears that plaintiff’s Spanish legal education, the degrees awarded to him, and the passage of the bar examination, resulted in his being licensed to practice in Spain, he has not, however, been formally admitted to practice before any court in Spain, there evidently being a distinction in Spain between being licensed and being formally admitted to the several courts.
3. On January 23,1959, plaintiff, on stationery describing himself as “Doctor Cornelius Joseph Greenway Bafferty, Attorney at Law,” Seville, Spain, wrote a letter to Colonel Arnold LeBell, Staff Judge Advocate, Sixteenth Air Force, Torrejon Air Force Base, Spain, in which plaintiff requested an interview for employment with the Air Force. He described his educational background and stated, among other things, that “To my knowledge I am the only American that is licensed to practice law in Spain,” and that he had received an LL. D. from the University of Seville in 1958.
4. (a) The Air Force in Spain had for some time been attempting to comply with a request from the Office of the Judge Advocate General in Washington, D.C., that a so-called Country Law Study be prepared for Spain. The Air Force was engaged in preparing such a study in all countries *364 where American military personnel were subject to trial in local courts. The study for Spain was to include a description of the court systems in Spain together with a review of the applicable criminal procedures. The study was to constitute, in general, a survey of the procedural aspects of Spanish criminal law as it would apply to American servicemen, with emphasis upon the existence or absence of provisions for due process as provided in the United States. In addition, on February 4, 1955, the Department of Defense, by Major General Kissner, and the Spanish “High General Staff,” by Lieutenant General Juan Vigon, had duly entered into a special “Procedural Agreement No. 16” which established “procedures for the exercising of jurisdiction, control and custody over members of the United States Forces alleged to have committed an offense in Spanish territory.” By 1959 the Air Force in Spain had accomplished some work toward the Spanish Country Law Study. The Spanish Criminal Code had been translated into English, and a preliminary study in summary form, which referred to and mentioned certain provisions of Procedural Agreement No. 16, had been prepared by a Spanish-speaking Air Force lieutenant and a Spanish attorney who were employed by the Air Force. However, it was recognized that a more thorough study was required, although at that time Colonel LeBell had no available personnel, military or civilian, who could be assigned to complete this project. One of the purposes of the study was to enable personnel at the Base to attend trials of servicemen and to observe, with understanding of the Spanish courts and the applicable procedures, whether the serviceman was receiving the rights to which he was entitled.
(b) Among other things, Procedural Agreement No. 16 provided:
c. Whenever a member of the United States Forces is prosecuted by the Spanish authorities, he shall be entitled to the same rights and privileges as those enjoyed by Spanish citizens in connection with judicial proceedings. The principal rights to which a member of the United States Forces shall be entitled are:
til Protection against Ex Post Facto law.
(2) Protection against Bills of Attainder.
*365 (B) A prompt and speedy trial.
(4) Be informed, in advance of trial, of the specific charge or charges made against him.
(5) Have a public trial and be present at his trial.
(6) Have the burden of proof placed upon the prosecution.
(7) Be tried by an impartial court.
(8) Be protected from the use of a confession obtained by illegal or improper means.
(9) Be confronted with the witnesses against him.
(10) Have compulsory process for obtaining witnesses in his favor, if they are within the jurisdiction of the Government of Spain.
(11) Have legal representation of his own choice for his defense during trial and pretrial procedures or shall be furnished free legal counsel under the same terms and conditions applicable to Spanish citizens.
(12) If he considers it necessary, to have the services of a competent interpreter.
(13) Have a representative of the United States Forces present at his trial.
5. On February 9, 1959, Colonel LeBell, feeling plaintiff might be particularly suitable for employment on the Country Law Study project, granted him an interview and discussed the proposed project. The Assistant Judge Advocate, Lieutenant Colonel "Ward, was also present at the interview. At this time, Colonel LeBell showed plaintiff the draft of the Country Law Study that had been prepared and explained the nature of the project. He informed plaintiff that a more thorough, definitive, study was desired but that he felt the draft should be used as a working base since it had already been submitted to the Judge Advocate General for preliminary approval and had been returned without change. Plaintiff assured Colonel LeBell that he was able to perform such a study. Plaintiff then submitted a signed Civil Service Commission Form 57 application for employment in which he listed as a reference “Mr. Spaulding, Consul Gen., U.S. Consular Service, Washington, D.C.” The reference was to Francis L. Spalding who had been an American Consular Officer stationed in Seville when plaintiff was also residing there.
*366 6. Following plaintiff’s interview with Colonel LeBell on February 9, 1959, the decision was made to hire plaintiff primarily for the purpose of completing and maintaining the Spanish Country Law Study. This work would necessarily require translations from Spanish to English. However, in view of plaintiff’s knowledge of the Spanish language and Spanish legal terms, it was also desired to use plaintiff as a general interpreter or translator. The task of preparing the official job description for this employment was assigned to several officers then stationed in the Office of the Judge Advocate, including Major Hugh J. Dolan. The job description, dated July 31, 1959, and providing for a GS-5 grade, read as follows:
Law Clerk — -Interpreter
$ 3$ $ ‡ $
I. INTRODUCTION: This position is located in the Office of the Staff Judge Advocate Headquarters Sixteenth Air Force which is responsible for all legal activities within this command. These functions include advice to the Commander on all matters relating to Military Justice, Military Affairs, Claims and allied legal matters. The purpose of this position is to perform research work in the field of Spanish law and prepare digests of findings for use of legal officers, to assist in the preparation and maintenance of a current law study and to act as an interpreter-translator.
II. Duties and Kesponsibilities : 1. Performs research in Spanish law and prepares digests or gives oral reports of findings to supervisors. The purpose of these studies is to determine the effect of Spanish law on particular cases involving- this command and its Personnel. Reviews all criminal cases involving American mission personnel in Spain and prepares an analysis of respective provisions of American and Spanish law as they affect basic rights guaranteed by the United States Constitution.
2. Maintains the Spain Country Law Study as directed by Headquarters United States Air Force. This involves, primarily, keeping the study current by translating into English changes in Spanish Law as they occur.
*367 3. Attends trials in Spanish Courts and Tribunals and explains the proceedings to trial observer by translation and interpretation.
4. Translates both legal and non-legal documents from English into Spanish and Spanish into English, covering any type of subject.
5. Assists in the planning and formulation of legal programs and policies dictated by the requirements of Spanish law. This entails the preparation of plans, directives, and letters predicated upon the laws of Spain as well as the pertinent rules of international law.
6. Works closely with both military and civilian members of the Staff Judge Advocate staff, has personal contacts with ranking officials and Spanish civilian and military organizations, with private individuals who are citizens of foreign nations in Spain and with military and civilian personnel who are citizens of the United States.
III. Controls Over Work: Position is supervised by the Staff Judge Advocate. Works independently in reviewing criminal cases involving mission personnel and preparing research studies and digests comparing and analyzing respective provisions of Spanish and American law. All work is subject to technical review of legal officers of the Staff Judge Advocate. Guidelines are in the form of Air Force procedures and directives, standard legal reference works, and the Spanish legal library in Madrid.
IV. Other Significant Facts : Incumbent must possess legal education in the area of Spanish and American law and have demonstrated high attainment in legal research in the fields of Spanish and International law. Must be able to employ tact and diplomacy when dealing with foreign nationals, in addition to nationals of the United States in Spain. _ Must possess a good knowledge, both reading and writing, of terminology of the Spanish and English languages.
The provisions concerning “the Spanish legal library in Madrid” in paragraph III were included on the basis of Major Dolan’s previous use of this facility as well as the use made of it by other attorneys employed by the Air Force. A bus was readily available for the relatively brief trip between the Air Base and Madrid.
7.Effective October 5, 1959, plaintiff was appointed, on a one-year probationary status, to a GS-5 position (“Excepted *368 Appointment — Conditional, Schedule A”) as a “Law Clerk-Interpreter” in the Judge Advocate’s Office, Torrejon Air Base, Spain. Plaintiff was hired as a GS-5 law clerk to conform to the practice existing with respect to Spanish attorneys hired by the Air Force.
8. (a) Major Dolan was one of the legal officers who had authority to assign and review plaintiff’s work. In this connection, on occasion Major Dolan assigned work to plaintiff involving the translation of Spanish documents. However, on some of plaintiff’s translations Major Dolan began to question plaintiff’s accuracy. Maj or Dolan himself had some knowledge of Spanish, and in addition there were others with knowledge of Spanish, including Spanish lawyers employed in the Judge Advocate General’s Office, who were available to Major Dolan for consultation. One Jose Can-dell, a Spanish attorney employed by the Air Force and assigned to Major Dolan’s office was, for instance, available for such consultation. On the occasions when Major Dolan differed with plaintiff’s translations, he discussed with plaintiff the alleged deficiencies and his ultimate conclusion not to accept plaintiff’s translation. Plaintiff was thus aware that Major Dolan considered his translation work to be deficient in certain respects. For instance, soon after plaintiff commenced working, he was asked to translate a provision of the Spanish Vehicle Code. Major Dolan, himself questioning the accuracy of plaintiff’s translation, asked Candell for his translation, which differed from plaintiff’s. After a full discussion of the matter between plaintiff, Major Dolan, and Candell, plaintiff himself agreed that Candell’s translation was correct, which translation was then accepted and reported back to the inquiring office at the Base.
(b) Lieutenant Colonel F. A. Byker, who was in charge of the legal aspects of the contract work at the Base, was another legal officer who had authority to assign work to plaintiff and to review such work. One such assignment was the translation of a Spanish document concerning proposed regulations governing a type of contract between the United States military authorities and Spanish nationals which was entered into and was to be performed in Spain. This type *369 of contract was referred to as a “Direct Contract.” Lieutenant Colonel Ryker was dissatisfied with plaintiff’s translation. He arrived at the opinion, after consultation with Candell, that there were many inadequacies in plaintiff’s work, including an inability to translate Spanish legal terminology into equivalent English terminology (such as plaintiff’s literal use of the word “celebrated” instead of a contract’s being “consummated”), as well as numerous errors involving tense and basic English grammar. However, his principal criticism involved plaintiff’s translation of the Spanish phrase “Contrato Directo” as “Prime Contracts” instead of “Direct Contracts.” Previous English translations had used the term “Direct Contracts.” Lieutenant Colonel Ryker was convinced that, under the circumstances, the latter theretofore uniformly translated term was correct as a legal phrase of art to describe a certain kind of contract, i.e., one entered into by a Spanish national and to be performed in Spain. After discussing with plaintiff his entire translation, Lieutenant Colonel Ryker caused plaintiff to redo it completely.
(c) Another assignment given to plaintiff in October by Lieutenant Colonel Ryker involved the translation of a Spanish Government decree relating to charges for telephone services furnished in Spain, and establishing new tariffs in connection therewith. One Spanish term used in the decree was “sobretasas,” which plaintiff translated as charges in the nature of taxes and which plaintiff concluded, the United States was, under the Mutual Defense Assistance Agreement of September 1953 between Spain and the United States, exempt from paying. Plaintiff’s translation was forwarded to higher authority which, however, criticized the Command because “sobretasas” was translated as an exempt “tax” instead of what was alleged to be the proper translation, i.e., a payable “surcharge.” On reexamination of plaintiff’s translation, and after checking with Candell, Lieutenant Colonel Ryker concluded that plaintiff’s translation was, in fact, unsatisfactory in the respects criticized. After further discussions with plaintiff, there was added to plaintiff’s translation a Spanish dictionary definition of the term as an “additional tariff that is charged upon the principal tariff.”
*370 (d) Both Major Dolan and Lieutenant Colonel Byker complained to Colonel LeBell about what they considered to be plaintiff’s deficiencies as a translator, including the incidents above-described. Lieutenant Colonel Byker advised that in his opinion plaintiff was unable to handle technical, legal terms. Candell also had advised Major Dolan that in Candell’s opinion plaintiff’s ability to translate was deficient. Plaintiff knew or should have known of Major Dolan’s and Lieutenant Colonel Byker’s dissatisfaction with his translation work. There is no showing that Major Dolan, Lieutenant Colonel Byker, or Spanish attorney Candell, were biased or personally prejudiced against plaintiff. Neither Lieutenant Colonel Byker nor Colonel LeBell themselves spoke or understood Spanish.
9. (a) During the first two weeks of plaintiff’s employment, Lieutenant Colonel Ward informed plaintiff that the Base’s Chief of Operations, a Colonel Adams, had received a summons to appear before the Municipal Court in Madrid to answer a complaint concerning his responsibility for a bite inflicted on a Spanish child by Colonel Adams’ dog. Lieutenant Colonel Ward showed plaintiff the summons. Plaintiff noticed that it was three weeks’ old and that the time had already passed within which Colonel Adams was required to appear in court. Plaintiff expressed a fear that Colonel Adams might be held in contempt of court. Thereupon Lieutenant Colonel Ward decided to confer with Colonel LeBell about the matter.
Colonel LeBell then ascertained that the summons had been left with Colonel Adams’ household maid who had, however, failed to give it to Colonel Adams in time for him to appear in court on the assigned date. Colonel LeBell then asked plaintiff to confer with Colonel Adams and ascertain what could be done about the matter. Plaintiff thereupon conferred with Colonel Adams who stated that he had kept his dog in a fenced-in area in his backyard but that passing schoolboys had provoked the dog, that one of them had hit the dog with a stick, and another had put his hand inside the fence railing and had been bitten. It was then agreed that plaintiff and Colonel Adams would go to court to explain the incident *371 in full, including tlie failure of the maid to deliver the summons. They arranged to meet the next morning to go to court in a staff car.
However, the following morning Colonel Adams failed to appear, and plaintiff sought instructions from Colonel Le-Bell, who directed plaintiff to go to the court and do his best on the matter. There was some question whether the offense involved amounted to a misdemeanor or a felony. Apparently felonies were required to appear on the officer’s personnel records, but not misdemeanors, and Colonel LeBell asked plaintiff to see what he could do about having the charge and the fine, considering all the circumstances, reduced to a misdemeanor if in fact it had been handled as a felony.
Plaintiff thereupon went to the court in Madrid alone and made his explanations to the Judge. However, the Judge showed plaintiff the signed statement of the child which indicated that the child was bitten while on school property and not while the dog was in the backyard fenced area. Plaintiff then became considerably concerned over the possibility that he was not in possession of the accurate facts. The Judge stated, however, that in Spanish law the person in charge of the dog at the time was responsible, and not necessarily the owner. Plaintiff stated that Colonel Adams was not even at home at the time and that the household maid was left in charge during the day. Thereupon, the court official stated that the maid was, accordingly, responsible for the dog’s action. As a result, he ordered the clerk of the court to erase Colonel Adams’ name from the court records and instead to insert the maid’s name. Plaintiff paid the fine involved and the Judge thereupon assured plaintiff that the matter was closed and that no police offense of any kind would appear against Colonel Adams. Elated, plaintiff returned to the Base to report the results to Colonel LeBell.
(b) However, Colonel LeBell was greatly disturbed about the changing of the court record. He felt that the maid had had no notice of the charge against her, and that the blame should not have been shifted to her without her knowledge, consent, or opportunity to appear. He was fearful of what effect such a criminal offense, possibly a felony, on her record *372 might have should she wish, for instance, to obtain a passport. He felt plaintiff showed poor judgment in causing the expunging of Colonel Adams’ name from official court records and the insertion thereon of the maid’s name as the defendant. He ordered plaintiff to return to court the following day with Colonel Adams or his wife and to have the records changed back to their original state.
(c) The following morning plaintiff returned to the court with Mrs. Adams and, after making the necessary explanations, requested the Judge to have the record changed again so as to show Colonel Adams’ name, and not the maid’s. The Judge complied with the request and caused the clerk of the court to make such change.
10. (a) Major Dolan was the officer who, upon plaintiff’s reporting to duty, furnished him all the data and materials the Base had concerning the Country Law Study, including the draft preliminary study that had already been prepared, a 6-page memorandum by a Colonel Burke relating to jurisdiction of the Spanish courts under Spanish law over United States military personnel in Spain, samples of other typical Country Law studies, Procedural Agreement No. 16, and the translation of the Spanish Criminal Code. Major Dolan also instructed plaintiff concerning the form and content of the proposed study, including consideration of the effect of Procedural Agreement No. 16 upon the substantive, internal law of Spain. Thereafter, and from time to time, Major Dolan had discussions with plaintiff about the project.
Shortly after plaintiff’s commencement of employment, he prepared a list of Spanish lawbooks which he requested be purchased by the Base and which plaintiff felt would facilitate the study. However, the books were not purchased during plaintiff’s employment. As stated, the law library in Madrid was available for plaintiff’s use, as set forth in his job description. There is no showing that plaintiff ever went to such library or sought to go in connection with the study.
(b) During the course of Major Dolan’s discussions with plaintiff concerning the study, plaintiff several times expressed the opinion that the study was useless because, in plaintiff’s opinion, the written Spanish statutory and other *373 provisions were meaningless in actual practice and that it was not, therefore, possible for United States military personnel to receive a fair trial with safeguards such as the constitutional ones with which American lawyers were familiar. He stated that the Spanish courts were politically dominated and controlled by the Franco dictatorship, that regardless of any so-called written safeguards, the third degree was widely employed in Spam, and that, contrary to the conclusions set forth in the preliminary study or to the provisions of the Procedural Agreement, in criminal prosecutions in Spain the burden of proof was not on the prosecution and there was no presumption of innocence. Plaintiff therefore felt the entire study to be a waste of time if it was to be based merely upon the written provisions of the Spanish Criminal Code or the Procedural Agreement.
(c) However, in his several discussions with plaintiff about the entire matter, Major Dolan differed with plaintiff’s views and attempted to change plaintiff’s attitude, but without success. Major Dolan stated that he had attended hundreds of trials in Spanish courts and that he had observed that the laws and procedures were actually followed. Pie therefore felt that the Spanish laws and legal procedures could be accepted as written and included in a Country Law Study. Candell too reported to Major Dolan that plaintiff had told Candell that Spain, being a dictatorship, was a lawless country and that the procedures written in the Code were meaningless. Finally, Major Dolan discussed the problem with Colonel LeBell and expressed his feelings that, considering plaintiff’s attitude, plaintiff was not the proper employee to perform the Country Law Study.
11. (a) As noted (finding 5), plaintiff had included Mr. Francis L. Spalding as a reference in his application for employment, and the personnel officials at the Base had, as a routine matter, written to this reference about plaintiff. Mr. Spalding, who was at this time stationed at the Department of State in Washington, replied that in his opinion plaintiff was emotionally unstable. In response to a further request from the Base for additional information, Mr. Spald-ing replied, by letter of November 13,1959, that when he and *374 plaintiff were in Seville, plaintiff “was apparently engaged in writing a paper on either the Spanish labor laws or juridical system which was critical of the Franco government”; that plaintiff “was extremely concerned that the Spanish authorities would make difficulties for him”; and that plaintiff “would interpret apparently insignificant incidents as evidence of hostility toward him on the part of the Spanish government.” He further stated that he believed plaintiff’s “emotional makeup could better be described as unstable rather than eccentric” and that plaintiff “* * * did not have what I would call a balanced attitude toward conditions in Spain, and I do not think he would be a suitable person for the Air Force to employ in Spain, if such employment is being considered.”
(b) Considering the adverse reports he had received about plaintiff’s work as a translator (finding 8(d)) and about plaintiff’s attitude concerning the Country Law Study (finding 10(c)), as well as the poor impression he had obtained about plaintiff due to the manner in which he had handled Colonel Adams’ case (finding 9(b)), Colonel LeBell became still further disturbed as a result of Spalding’s letter. He was most concerned about plaintiff’s fitness to perform the Country Law Study, the principal purpose of plaintiff’s employment. Accordingly, and in view of the fact that he had thus far received no report of any kind from plaintiff as to any progress he was making on the study, Colonel LeBell decided that he must soon inquire personally of plaintiff as to the work he was doing on the study.
12. (a) On November 24,1959, Colonel LeBell inquired of plaintiff concerning the extent of his progress on the Country Law Study. Plaintiff replied that he had made no progress on the study and that it was not possible for him to make a study on procedural safeguards because no such safeguards existed in Spain. Colonel LeBell stated that to his knowledge, as a result of having been in Spain two years, there were such safeguards and that they could be found in the Spanish Criminal Code as well as in Procedural Agreement No. 16. Plaintiff responded, however, that the Spanish laws were meaningless and that no impartial trial could be af *375 forded an American soldier in Spain since the Spanish judges, owing their allegiance and positions to Franco as Chief of State, as did the prosecutors, could not be impartial. Colonel LeBell answered that plaintiff should not concern himself with the political situation in Spain but only with the legal problems, such as the actual Criminal Code and Procedural Agreement provisions. However, plaintiff reiterated that in his opinion there could be no impartiality in the Spanish courts, that no accused could, therefore, be afforded a fair trial, that the written provisions were meaningless, and that, consequently, he could not complete the study if it were to be based on any assumption that our military personnel could receive any procedural safeguards or a fair trial. Colonel LeBell then stated that since plaintiff was essentially hired to perform a study setting forth in detail the procedural safeguards, but was now stating (according to Colonel Le-Bell’s interpretation) that in effect such a study could not be performed (since there were no procedural safeguards), there was no point in plaintiff’s being employed any longer. Plaintiff responded that he would be willing to write anything that Colonel LeBell desired, but if it involved stating that United States military personnel could have any assurances of a fair trial before an impartial judge as those terms are used in the United States, he would not be able conscientiously to sign such a study.
(b) Asa result of this interview, Colonel LeBell felt that the reports he had received from Major Dolan concerning plaintiff’s attitude constituting a disqualification for the accomplishment of the Country Law Study had been verified. He concluded that since the principal purpose of plaintiff’s employment had been frustrated, and further, in view of the unsatisfactory reports he had received concerning plaintiff’s work as a translator, as well as the poor opinion he had of plaintiff’s handling of Colonel Adams’ case, plaintiff’s employment should be terminated. This decision was made, on the basis of the information he then had, honestly and conscientiously and, in Colonel LeBell’s best judgment, for the good of the service. Colonel LeBell had no personal bias or prejudice against plaintiff, nor was he maliciously motivated.
*376 13. (a) Colonel LeBell then discussed with, the Chief of Staff at the Base, Major General Mooney, his conclusion that plaintiff should be discharged. General Mooney left the matter up to Colonel LeBell as Staff Judge Advocate and as plaintiff’s supervisor under plaintiff’s job description. Colonel LeBell then further discussed the matter with Assistant Judge Advocate Lieutenant Colonel Ward, and with Lieutenant Colonel Byker, both of whom agreed that plaintiff should be dismissed.
(b) Colonel LeBell then consulted the Personnel Section at the Base as to the proper procedure to be followed in effecting plaintiff’s termination of employment. That section advised that, since plaintiff was still in his probationary period, all that was necessary under the applicable Air Force Begulations was to serve him with a notice of separation for disqualification, with a statement of reasons, and fixing an appropriate termination date.
14. On November 30, 1959, Colonel LeBell served upon plaintiff in Colonel LeBell’s office the following letter of such date, Lieutenant Colonel Ward also being present:
30 November 1959
Notice of Separation- — Disqualification Dr. Cornelius J. Greenway Office of the Staff Judge Advocate Headquarters Sixteenth Air Force APO 283, New York, N.Y.
1. You are hereby notified that you will be separated from the service at the close of business on Friday, 4 December 1959. Tins separation is being effected during your trial period for reasons of inefficiency. As you were informed at the time of your appointment, the purpose of the trial period is to give management an opportunity to fairly evaluate an employee’s capability to perform the duties of the position to which he has been assigned. The specific reasons for this action are as follows:
a. On or about 15 September 1959, you were given the job of assisting Lt Colonel Byker of this office in connection with a project involving a proposed Spanish-American agreement concerning Direct Contracts. This work required that you make use of your knowledge of the Spanish language and law, and more particularly, of the *377 technical legal terms involved. This was a matter of great importance and over a period of time understandably would govern the expenditure of enormous sums of money by the United States Government. Your end product was so poorly accomplished that it was necessary for you to re-do the entire matter.
b. In late October or early November 1959, you were asked to translate a “Boletín Oficial” issued by the Spanish Government relative to the imposition of “sobre-tasas” upon various services and facilities relative to telephonic service in Spain. Your translation was ultimately forwarded to higher authority, which criticized this command unduly because of the poor translation and incomplete legal conclusions reached by you. Such a manner of performance of your duties in legal matters as is illustrated by these transactions is a clear indication that you are not qualified to perform the work listed as essential in your job description and for which you were initially hired.
c. In November 1959, I discussed with you a job assigned to you when you first arrived, which assignment was imposed upon this command by Headquarters USAF. As you know from our previous discussions at the time you were interviewed for your present position, as also from your job sheet, this study was a ma,in purpose for which your job was established and for which you were hired. In our discussion of November 1959, you stated to me that you could not do this study because of your concept concerning the Spanish Government. A previous draft, made before your arrival and given to you, revealed that the Spanish judicial system contains the rights in question insofar as criminal law affecting our Armed Forces is concerned, and that the study can be accomplished. Aside from your conclusions in the matter, you submitted nothing showing any constructive effort to accomplish this job. Your decision in this matter evidences to me a mental attitude and use of judgment completely incompatible with the requirements for completing this study and other collateral demands in your job sheet.
d. In or about October 1959, you were given the job of handling a matter of simple legal assistance for Colonel A. F. Adams, Director of Operations for this command. In working thereon, you went to the appropriate Spanish court and shifted the responsibility for the tort involved from Colonel Adams to a Spanish National in his employ, without first ascertaining whether *378 or not this Spanish National was involved. Colonel Adams was justly angry at your actions and you brought this office into an unfavorable light within this command. Accordingly, in the course of attempting to solve this legal problem, you made an absolute misuse of judgment. Such conduct cannot be tolerated.
2. If you wish, you may discuss your case with Mr. Charles A. Roberts, Employee Utilization Officer, 3970th Combat Support Group Civilian Personnel Office, Tele-Shone No. 2423. It is requested that you contact Mr. Roberts for base clearance instructions prior to the date of your separation.
3. I regret the necessity for taking this action; however, the same is taken in the best interests of the Air Force. During this notice period, you will be retained in a duty status.
/s/ Arnold LeBell Colonel, USAF Staff Judge Advocate
Received: SO November 1959 /s¡ Cornelius J. Greenway
15. Upon receipt of the November 30, 1959 letter, plaintiff was granted a conference with General Mooney. However, General Mooney refused to overrule Colonel LeBell.
16. After the service of the discharge letter of November 30,1959, the Personnel Section informed Colonel LeBell that it had been mistaken in the previous advice it had given to him concerning the procedure to be followed since recently adopted Air Force Regulations pertaining to probationary employees, contained in the Air Force Manual, entitled such employees to a right to reply to the charges and a notice of final decision after a consideration of the reply. The pertinent provisions of the new regulations were as follows:
AFM 40-1, Chap. AF S-l, Sec. 4, par. 6, Nov. 8, 1959:
6. Separation — Disqualification
a. When it has been determined * * * that an employee serving in his probationary or trial period is not qualified for reasons of * * * unsatisfactory performance * * * for continued employment, a notice of separation will be issued to the employee with a statement of reasons. The statement of reasons should be sufficiently detailed to clearly establish the employee’s unsuitability for continued employment. * * *.
*379 b. When appointment is made subject to satisfactory completion of suitability investigation, separation by disqualification may be used for taking action based on suitability * * *.
c. An employee separated by disqualification will be given an advance notice, right to reply and a notice of final decision.
Appendix A to AFM 40-1, Chap. AF S-1.5, Nov. 8, 1959:
4. CONSIDERATION on Reply. Preference veterans will be accorded a personal interview by the signer of a proposed notice.[6] In the interest of good management, all other employees may be accorded a personal interview upon request. When a personal interview is granted, the gist of the interview will be summarized. The official to whom the reply is made will consider all the facts presented by the employee and will determine whether the proposed action should stand or be modified.[7]
5. Status oe Employee During Notice Period. A statement will be included as to the employee’s work, or pay status during the notice period. * * * no action will be taken to change the work or leave status of an employee during the notice period. * * *
í¡< í¡í **i
7. Delivery oe Notice.
a. Wh.en possible, the notices will be handed to employee personally, before a witness. * * *
17. On December 2, 1959, Colonel LeBell served the following “amended notice” on plaintiff:
Amended Notice of Separation — Disqualification
❖ * * & *
1. This will refer to my letter of 30 November 1959, Subject: Notice of Separation — -Disqualification. Upon receipt thereof by you, your comments were to the effect that “There is not much to say, is there, except that you are absolutely right”. Since then, you have made an informal written and oral appeal to the Commander which, under existing Civil Service [Regulations, should be formalized, if you so desire.
*380 2. Recently revised Air Force regulations prescribe application of certain specific procedures in a separation action of this nature; accordingly, the following amendments to the above cited letter are made:
• a. Para. 1 is amended to read: “It is proposed to separate you from the service effective at the close of business 11 December 1959. This separation is being proposed during your trial period for reasons of inefficiency. As you were informed at the time of your appointment, the purpose of the trial period is to give management an opportunity to fairly evaluate an employee’s capability to perform the duties of the position to which he has been assigned. The specific reasons for this action are as follows:”.
b. Para. 2 is rescinded.
c. Para. 4 (added) :
You may answer this notice in writing to the undersigned. You may also submit affidavits in support of your answer. You will be allowed 5 working days from the date of receipt of this letter to submit your answer. If you do not understand the above reasons for this proposed separation, contact the undersigned for further explanation. If you care to read any civilian personnel regulations pertinent to the action or obtain information about how you make a reply, you may contact Mr. Charles A. Roberts, Civilian Personnel Office, Building 123, telephone extension 2423.
d. Para. 5 (added)
In view of para. 2a above, no final decision has been or will be made until after the time allowed for reply. Any reply you make will be given careful consideration before a final decision is made. Whether or not you reply, a written notice of final decision will be given you.
/s/ Arnold LeBeil Colonel, USAF Staff Judge Advocate
Received: December 1959 /s/ Oornelius J. Greenway
18. (a) After plaintiff was served the letter of December 2.1959, he was given no further assigmnents and instead was permitted to work full time during office hours on his reply to the charges. Plaintiff was furnished with such materials as he requested in preparing his reply. Plaintiff completed his reply and submitted it to Colonel LeBeil on December 9.1959.
*381 (b) Plaintiff’s reply, dated December 9, 1959, was a voluminous document of 71 typewritten pages plus a number of exhibits and affidavits. Among other things, the reply contained the following:
As to Charge 1, plaintiff pointed out that the date of September 15, 1959, contained therein was erroneous, plaintiff not having been employed at that time; that Lieutenant Colonel Ryker himself could not speak Spanish; that, specifically, plaintiff’s translation of “Prime Contracts” as against “Direct Contracts” was correct; that the document involved which Lieutenant Colonel Ryker had him translate from Spanish into English had originally been translated from English into Spanish, that Lieutenant Colonel Ryker had objected to differences between plaintiff’s English translation and the original English draft, but that differences could always be expected from such successive translations, and that “I never did find out the object of translating this document so many times in and out of the English and Spanish languages but I can think of far more enjoyable games the Staff Judge Advocates could play on the Government’s time”; and that a United States Embassy approved translator had made a statement to the effect that plaintiff’s translation was correct.
As to Charge 2, plaintiff contended that his translation was correct, as shown by the translation of another United States Embassy certified translator; that in any event a signed statement from the telephone engineer at the Base, who spoke and read Spanish fluently, and who was the Base’s liaison officer on telephone matters with higher authority (the Joint United States Military Group, Spain, known as “JUSMG”), defended plaintiff’s views because the Mutual Defense Agreement between Spain and the United States had a Tax Relief Clause annexed which unequivocally exempted the United States from liability for the payment of all “sobre-tasas,” so that actually it made no difference what the correct translation of the term was, and that plaintiff’s recommendation that the matter be taken up with the Spanish Ministers involved who promulgated the decree, with a view to obtaining a special favorable ruling based on the Tax Relief Clause, *382 was sound; that in fact higher authority did follow his suggestion and did obtain such a favorable ruling; and that “the only conclusion in this telephone case is that someone got his lines crossed.”
As to Charge 3, plaintiff denied he was biased against the Spanish Government and included a long section entitled “My Life In Spain” in support. He also related his contacts with Mr. Spalding at the Embassy in Seville. He further stated that he had no bias against the Spanish people or Government and that in fact, as a result of learning to know the Spaniards well, he was in favor of the Franco regime; that he had married a Spanish woman; that he had no criticism of the Spanish legal system but that .it could not be considered to afford the same rights as the American system “because they govern two different worlds, both distinct, both good”; and that plaintiff could not “doctor up” the study that had already been partially completed and which made it appear that “due process of law” rights similar to those obtained in the United States could also be had in Spain, but that he could instead write a true and objective legal study on the entire Spanish system “so that the Chiefs of Staff and the Senate can draw their own conclusions.” In answer to the statement that he had submitted nothing, plaintiff, to demonstrate what he could do, annexed a Spanish legal study that he had completed on his own time. The study included a lengthy discussion of “Offences Against The Person,” including “Homicide” and “Murder,” as well as “Persons exempt from criminal responsibility,” such as “Minors” and “Insane Persons.”
As to Charge 4, plaintiff answered that “legal representation is not a responsibility of a legal clerk,” but defended his handling of the matter. He annexed an affidavit of the Judge of the Municipal Court before whom he had appeared who stated that plaintiff had “acted in good faith * * * and with good judgment and intelligence not to prejudice anyone and especially the servant” and that “Even if she had been condemned as responsible * * * nothing would have happened to hurt her in life.”
Plaintiff then included a section contending that his separation was not in conformity with the applicable Air Force *383 rules and regulations. He again emphasized the erroneous date in Charge 1 and further claimed the second letter was ineffective because it purported to amend the first letter which was conceded to be defective, and that the first letter proved that a decision had already been made in plaintiff’s case. He also contended “That management was inefficient and wanton in its conduct during my probationary period and is guilty of gross negligence and non performance of its supervisory obligations and responsibilities under the Federal Personnel and Air Force Regulations.” In this connection, plaintiff relied on an alleged “Supervisor’s Handbook.”
Also set forth was a section entitled “Accomplishments” detailing what plaintiff felt he had accomplished during the two months he had served. Affidavits were also attached from persons who praised plaintiff. Another exhibit was a “book” plaintiff had written in Spanish in 1956 on “Anglo Saxon Law” in which he stated he had “received much favorable comment both from Spanish as well as American legal experts.” Plaintiff concluded with a section entitled “Defamation” in which he charged that his reputation had been disparaged; that he considered “that this case is already decided and this answer has no value”; that the “humorous attitude” he had taken “on this whole matter” was possibly due to his desire “to hide my real feelings in the case”; that he had spent “24 years of my life and over 40,000 dollars on my education”; that “I have become the most qualified American International lawyer in the Spanish judicial system” ; and that he could “not afford to have my name and profession be blackened by these irresponsible accusations. With this in mind it is my intention to petition the Spanish civil court to accept jurisdiction in a tort action for defamation on the 12th of December 1959.”
19. Colonel LeBell read and considered plaintiff’s reply, as did Lieutenant Colonel Ward. In this connection, Colonel LeBell also considered memoranda dated December 4 and 5, 1959, written by Lieutenant Colonel Ryker at Colonel Le-Bell’s request, which concerned Charges 1, 2, and 4, and to which were attached plaintiff’s translations which were the subjects of Charges 1 and 2. Colonel LeBell also discussed plaintiff’s reply with Lieutenant Colonel Ryker. It was *384 Colonel LeBell’s ultimate conclusion that plaintiff bad failed satisfactorily to answer tbe charges and that plaintiff’s employment should be terminated. This decision was honestly and conscientiously arrived at in good faith after considering the problem on the basis of all of the materials and information he had before him at that time.
20. (a) On December 11, 1959, Colonel LeBell served upon plaintiff the following letter, dated the same day:
11 December 1959
Decision to Separate for Disqualification
Dr Cornelius J Greenway
Office of the Staff Judge Advocate
Hq Sixteenth Air Force
APO 283, US Forces
1. By letters dated 30 November and 2 December 1959, you were notified of a proposal to separate you for reasons which disqualify you for employment because of your unsatisfactory performance of assigned duties. The reasons were stated in paragraphs la through Id of the letter of 30 November 1959.
2. On 9 December 1959, you submitted an answer to the aforementioned two letters. Full and careful consideration has been given to your answer, and while it indicates your reasoning for your manner of performance of your assigned duties, it does not in any manner disprove the matters set forth as reasons for your separation. The following matters in your answer were particularly noted:
a. You go into great detail about your performance of duties other than those listed for separation, about incidents in your life prior to your employment, and about your thoughts on the efficiency of the Staff Judge Advocate and his office. These comments, likewise, do not refute the matters set forth in paragraphs la through Id of the letter of 30 November 1959.
'b. As indicated in paragraph lc of that letter, a main purpose for your employment was the completion of a study as outlined. As further stated in the same paragraph, you submitted nothing to show a constructive effort to accomplish this work, and when asked about your progress on this job, you stated you could not perform it because of your concept concerning the Spanish Government. What you have attached, to your answer pertaining to this study was never submitted by you and this emphasizes the dereliction mentioned, namely, that you submitted nothing. You could have made a study, *385 as you were supposed to do, and indicated therein your concept of the Spanish judicial system insofar as criminal law affecting our Armed Forces is concerned, and left it up to your supervisors to make whatever use of the study was deemed necessary. The statements in your answer reputedly made by me concerning this study have no basis in fact.
c. You state your job position does not require you to represent persons in Spanish court but only to act as a translator or interpreter for trial observers. This is correct, and the reason you were not required to represent anyone is based on a lack of anything in the records you submitted on employment to show that you were qualified to practice as an attorney before Spanish courts.
d. In regard to the date indicated in paragraph la of the letter of 30 November 1959, this was simply a typographical mistake which you fully realize since your answer to the letter admits working on the project.
e. You state that your right to appeal was completely disregarded in the notices you were given on 30 November and 2 December 1959. Under appropriate regulations for personnel in your category, you have no right to appeal.
3. Each of the reasons for separation stated in paragraphs la through Id of the letter of 30 November 1959 is fully supported by the evidence and warrants your separation. Since your reply did not adduce evidence which refutes or disproves the reasons therein stated, the decision to separate has been based on the evidence of record.
4. You will be separated as of the close of business on ' 11 December 1959. You are requested to report not later than 1300 hours, 11 December 1959, to the Civilian Personnel Office, Building 123, for purpose of effecting clearance.
For the Commander : /s/ Arnold LeBell Colonel, USAF Staff Judge Advocate
Kegeived : 11 December 1959 /s/ Cornelius J. Greenwat
(b) Plaintiff was removed from the payroll as of the close of business on December 11, 1959, and was required, under escort by the Provost Marshal, to leave the Base that day. As set forth in this court’s decision of October 11, 1963 in this case, this notice should have provided for plaintiff’s termina *386 tion on December 12,1959, instead of December 11, 1959, so that plaintiff should have been retained on the payroll one additional day.
21. (a) On December 21, 1959, plaintiff wrote to Senator Clair Engle requesting the introduction of “legislation in the Senate permitting me to sue the United States Air Force for defamation of character and breach of contract.” The letter further stated in part:
Last October I was appointed legal counsellor on Spanish Law for the Sixteenth Air Force and was commissioned to write a legal study in accordance with the Senate’s Resolution on the Status of Forces Agreement.
After six weeks of employment in the Office of the Staff Judge Advocate at Torrejon, Spain, I was shown a legal study already written by a Spanish national which had been forwarded to the Judge Advocate Office in Washington and rejected by that authority.[8] I was told by the Staff Judge Advocate Colonel Arnold LeBell, who had just returned from the NATO Judge Advocate’s conference in London, that I had to “doctor up” the rejected legal study to appear authentically supported by articles in the Spanish Judicial Code. This would mean that I would necessarily have to fraudulently fabricate something that doesn’t exist. The rejected study stated that all the rights granted by the 14th Amendment of the United States Constitution as due process of law was also granted to every Spaniard under the Spanish Judicial System. I told the Staff Judge Advocate that this legal study was a deception on the Senate Resolution for the Spanish Judicial System Did Not grant these rights contained in the 14th Amendment; that in Spain since 1936 the right of trial by jury has been outlawed; that an impartial court would be impossible since the Judge and the Prosecuting Attorney is appointed by the same Minister of Justice who in turn is responsible to the Chief of State General Franco, and the law provides no means of challenging a Judge if he is publicly known to be prejudiced; that involuntary confessions and the use of cruel and inhuman treatment to obtain such confessions is not only admissible but the rule.
As it is readily seen, to “doctor up” a legal study in fraud of the principles of the Senate Resolution would *387 be impossible for me a loyal American Citizen and the most qualified American International Attorney on the Spanish Judicial System. When I told the Staff Judge Advocate Colonel LeBell that I could not justify tins rejected legal study with the truth I was promptly dismissed from my position as legal counsellor for the Air Force in Spain and denied any appeal against the false accusations of inefficiency directed against me.
I discussed my dismissal with Major General H. Mooney and gave the General an eleven thousand word answer to my separation notice explaining about the dishonest project the Staff Judge Advocate ordered me to write. General Mooney told me that he had no other alternative than to back his Colonel.
I have defended the Constitution of the United States and the integrity of the Senate and for such service I have been dishonorably separated from the Government service without being given the right to appeal. I believe that I am entitled to have the basic right to defend my name and profession from the stigma of malicious accusations after spending $40,000 and 12 years of University study to achieve my position in life.* * *
(b) The record does not show what, if any, response was made to this letter.
22. (a) When plaintiff had reported for duty on October 5,1959, he executed a Transportation Agreement under which he agreed to remain in the service of the Air Force in Spain for a minimum period of 24 months and, further, that he would not be eligible for return transportation to his place of residence in the United States (Sun Valley, California) until he had completed such period of service. However, pursuant to regulation, exceptions were made in certain instances, one of which was the situation where the employee “is disqualified by lack of skill to perform duties for which recruited.” [9]
*388 (b) The Base concluded that plaintiff was, under said regulation, eligible for return transportation, and, on December 24,1959, sent to plaintiff the following letter:
1. Our records indicate that at the time of your separation from the position of Law Clerk Interpreter in the Judge Advocate’s Office, Sixteenth Air Force, you were not notified of your eligibility for return transportation at government expense to your point of residence in the United States for you and your dependents. This transportation is available to you upon written application. Such requests must be received in this office in time for all transportation to which you are eligible, to be arranged and completed prior to 10 Mar. 1960.
2. In the event you choose to exercise these rights, the attached forms must be completed and returned to this office without delay. Regardless of whether you choose to return to the United States or forfeit your transportation rights, it is requested that this office be advised of your decision in this matter within 3 days after your receipt of this letter.
23. (a) On January 15,1960, plaintiff, while still in Spain, appealed his dismissal to the Appeals Examining Office, Bureau of Departmental Operations, United States Civil Service Commission. In his appeal, he made generally the same statements contained in his reply to the charges and his letter to Senator Engle, including the statement that: “The Spanish Judicial Code doesn’t provide trial by jury (outlawed since 1936 by General Franco) or does it prohibit the use of forced confessions or the use of brutal or inhuman treatment to obtain such involuntary confessions,” and that “I have no criticism of the Spanish Judicial System for the Spaniards, but I have my own personal ‘Monroe Doctrine’, Europe for the Europeans and America for the Americans. To justify the Spanish System to appear to be the same as the American System and giving the same rights as the American Constitution’s Fourteenth Amendment (the finest document ever written) would be impossible because they govern two different worlds, Tooth distinct, Tooth goodP
(b) By letter of February 12,1960, to plaintiff (in Seville, Spain), the Civil Service Commission’s Appeals Examining Office informed plaintiff in part:
*389 Civil Service Commission regulations do not provide a right of appeal to the Commission to Federal employees serving under excepted appointments unless the employee is eligible for the benefits of section 14 of the Veterans’ Preference Act of 1944, as amended.
Since you were serving in a position in the excepted service and you are not entitled to preference eligibility under the Veterans’ Preference Act, we can take no action in your case.
The appeal is denied.
24. (a) On February 16, 1960, plaintiff appealed to the Board of Appeals and Review of the Civil Service Commission. In connection therewith he stated: “I insist that the Board * * * subpoena the said Colonel Arnold LeBell to produce to the Board my seventy-one page answer to his false accusations of inefficiency and intolerable conduct.”
(b) By letter of February 24, 1960 to plaintiff, the Board of Appeals and Review reviewed the applicable regulations and concluded that “no basis exists for accepting an appeal from you and the decision of the Appeals Examining Office is affirmed,” and that:
In view of the Board’s lack of jurisdiction in your case, the subpoenaing of your reply to the agency’s notice and a hearing before this Board would serve no useful purpose, and your requests in this regard must be denied.
25. (a) Plaintiff executed the' application for return transportation which was sent to him on December 24, 1959 and, on February 28,1960, plaintiff and his dependents (wife, son, and father), together with their household goods, departed from Madrid, pursuant to “Special Orders,” and were transported to California at Government expense. Plaintiff also received a per diem allowance during the period of travel.
(b) As a result of plaintiff’s being given return transportation to the United States, the formal “Personnel Action” form (Standard Form 50) which had been previously executed on December 11, 1959 with respect to plaintiff’s termination of employment on such date, and showing the official action to be “Separation — Disqualification (Inefficiency),” was, on February 5,1960, amended so as to show the effective *390 date of plaintiff’s separation as March 4, 1960, instead of December 11, 1959, “in order to carry the employee on the rolls of this Agency until he has performed authorized travel as provided in AFM 40-10.” However, the amended form further stated that “Employee will be in a leave without pay status from 12-12-59 until completion of this authorized travel.” Plaintiff received no additional salary as a result of the transportation expenses being defrayed, his last salary day remaining December 11,1959.[10]
26. Prior to May 16,1960, plaintiff, in person, appealed to the Office of the Secretary, Department of the Air Force, Washington, D.C. However, by letter of such date to plaintiff, James P. Goode, that Office’s Deputy for Manpower, Personnel & Organization, advised plaintiff that:
The complete file on your separation, including the material you submitted in reply to the notice of separation, has been reviewed. I do not find any evidence of impropriety or irregularity ,in the procedures and merits of your separation from an Excepted Appointment— Conditional during the trial period. Accordingly, the separation action will not be changed.
27. (a) During the period of plaintiff’s employment, there was in force and effect Air Force Begulation AFM 40-1, Section 2, entitled “Grievance Procedure for Air Force Civilian Personnel” (AF E2.2, dated March 7, 1955), para *391 graph 6 of which (AF P4.2, July 15, 1959) pertained to “Probationary and Trial Period Evaluation.”
Pertinent provisions of such paragraph are as follows:
The probationary or trial period (see Chapter AF X-l) is the final phase of the examining process. During this period the employee’s performance, general character traits and conduct will be evaluated to determine his fitness for successful Federal employment. If after a full and fair tryout, it is apparent that an employee is unsuited for continued employment, he can be separated without undue formality at any time prior to the expiration of the probationary or trial period. Completion of a probationary or trial period is automatic upon completion of the required period of service. Therefore, the following positive steps must be taken prior to completion of this period in accordance with the general provisions of paragraph 2, ;in order to determine whether the employee will be retained in the position or will be reassigned, changed to lower grade, or separated.
a. The performance, conduct, and general character traits of employees will be evaluated continually and discussed with employees frequently during their probationary or trial period. * * *
b. Supervisors will provide employees with the guidance and assistance necessary for development in the position. Any discussion of the employee’s performance, conduct, or general character traits should be straight forward and constructive, and means of effecting improvement will be suggested, whenever needed.
c. If, after a fair trial and assistance to improve, the facts indicate that the employee is failing to qualify in the position, the supervisor will consult the placement adviser and recommend reassignment, change to lower grade, or separation, whichever is appropriate. The recommendation may be made either prior to or at the time of the written appraisal required by section 4. However, it will not be delayed until the time of the written appraisal if it is apparent earlier that the employee will not qualify for the position.
d. After an evaluative interview with the employee, the placement adviser will seek to effect the appropriate action. When change to lower grade or reassignment is recommended and no suitable vacancy exists or assignment to another position is not feasible, the placement adviser will consult with the supervisor to determine *392 whether or not separation action should be taken. Reassignment or change to lower grade may be effected when separation has been recommended only when the employee’s performance, conduct, and general character traits indicate that he will be able to qualify in another position and a suitable vacancy exists. Inasmuch as service prior to reassignment or change to lower grade in the same line of work is creditable toward completion of the probationary or trial period (see Chapter ÁF X-l), an employee who is failing to qualify in Ms position will be changed to another position in the same line of work only when a sufficient portion of the probationary or trial period remains in wMch to determine Ms fitness for retention in that position.
(b) Plaintiff’s position, and the job description therefor, especially the duties relating to the Country Law Study, was specifically fasMoned for the particular task. There was no other position open at the Base which would have constituted a suitable vacancy for plaintiff.
CONCLUSION OB LaW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover in accordance with its opinion of October 11,1963, the amount of recovery to be determined in accordance with Kule 47 (c) (2).

 Plaintiff translated it as “Prime Contracts.” The alleged correct translation was “Direct Contracts,” said to have become a legal phrase of art as to certain kinds of contracts entered into in Spain. See finding 8(b).

 Translated by plaintiff as a “tax.” The alleged correct translation was “surcharge.” See finding S(c).

 Paragraphs 6a and 6b (AF P4.2, issued July 15, 1959), headed “Probationary and Trial Period Evaluation,” of Section 2 (AE E2.2) of Air Force Regulation AFM 40 — 1, issued March 7, 1955, entitled “Grievance Procedure for Air Force Civilian Personnel.” See finding 27 (a).

 Paragraph 4, “Consideration of Reply,” Appendix A to A I'M 40-1, Chap. AE S — 1.5, November 8, 1959.

 Plaintiff further relies on noncompliance with apparent suggestions to supervisors allegedly contained in an Air Force “Supervisor’s Handbook,” such as the keeping of certain records with respect to the work performance of employees. However, the handbook is not even in evidence. Nor is there any indication that the contents thereof were ever promulgated in the form of a regulation. Informal memoranda or documents of this kind seemingly directed only to internal management do not confer substantive rights on employees to recover lost salary whenever some suggestion or working rule contained therein is not observed by a supervisor. DeBusk v. United States, 132 Ct. Cl. 790, 795-6 (1955), cert. denied, 350 U.S. 988 (1956). Even a deviation from a formal regulation does not vest rights in third parties when the regulation is issued merely for the guidance of certain agency personnel. Centex Construction Co. v. United States, 162 Ct. Cl. 211 (1963).

 Plaintiff was not a preference veteran.

 Pertinent provisions of tMs regulation relating to “Effective Dates” and “Statement on Reply” were set forth in the court’s opinion of October 11, 1963.

 The record fails to support plaintiff’s repeated contention that this preliminary study, prepared before plaintiff’s employment, was “rejected” by the Air Force Judge Advocate General.

 ARM 40-10 (July 20, 1956, Revised), Chapter 4, Section 21e (October 20, 1959) provided:
21. Acceptable Reasons for Return During Agreed Employment Period.
An employee, returned from an oversea official duty station during a period of agreed employment by which eligibility for transportation at Government expense is established, will not be considered as having violated his transportation agreement under the following conditions:
*****
c. Convenience of the Government. When the employee is returned for the convenience of the Government, or separated because he is * * * disqualified by lack of skill to perform duties for which recruited or for any other duties to which he could be assigned.

 At first, said personnel action of December 11, 1959 was, by another action of January 20, 1960, canceled, such action evidently being thought necessary in order that return transportation could be provided. However, this cancellation action was in itself canceled by another personnel action of February 5, 1960, the original cancellation being stated to have been “erroneously effected.” On the same day, the original separation action of December 11, 1959, was then amended, as set forth. By a letter of February 8, 1960 to plaintiff, the Base explained these personnel actions and advised “In order to provide you with the transportation to which you are entitled, it Is necessary that you be carried on the rolls of this organization until such travel has been completed. * * * Attachment 2 to this letter [the amended personnel action] is a Standard Form 50 which postpones your separation date and simultaneously places you .in a leave without pay status commencing 12 Dec 59 and continuing until you enter travel status. During your travel period, you will be carried in a duty status. The separation date shown on attachment 2 [March 4, 1960] is a projected date, based on maximum time allowed to accomplish such travel.”
Evidently plaintiff’s travel was not completed by said date of March 4, 1960, since, by. another personnel action of April- 6, 1960, the effective date of plaintiff’s separation was again changed to March 14, 1960.