Richard D. MEEHAN, Appellant,

v.

John W. MACY, Jr., Chairman, et al.,
Civil Service Commission, et al.,
Appellees.

No. 20812.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 10, 1967.

Decided April 18, 1968.

As Amended May 22, 1968.

Mr. Edward L. Merrigan, Washington, D. C., for appellant.

Mr. Joel M. Finkelstein, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Mrs. Ellen Lee Park, Asst. U. S. Attys., were on the brief, for appellees. Mr. Scott R. Schoenfeld, Asst. U. S. Atty., also entered an appearance for appellee.

Before EDGERTON, Senior Circuit Judge, and TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

This is an appeal from an order granting the Government's motion for summary judgment dismissing an action by a former employee of the Canal Zone who attacks as unlawful his 1964 discharge by the Canal Zone Government, which was affirmed by the Civil Service Commission in 1965.

We conclude that one of the charges against appellant has been established, but not the other two, and remand so that the agency may consider his case in the light of our rulings.

## I BACKGROUND AND AGENCY PROCEDURE.

On January 9, 1964, American authorities in the Canal Zone rejected the request of some 200 Panamanian students, who had made an unannounced march to Balboa High School, that the United States flag be lowered and replaced by the Panamanian and American flags raised simultaneously. The students refused to leave the Zone when requested to do so and rioting broke out.

Between January 9 and January 15, 1964, groups of rioting Panamanians marauded the Canal Zone, protesting the terms and conditions of United States occupation of the Zone. The damage was extensive and when the violence subsided an aura of tension persisted, generated by fears that renewed outbursts might erupt. Panama-United States diplomatic relations, which had been ruptured with the first violence, remained severed, and were not resumed until April 3, 1964.

The United States authorities began a search for means to improve the situation. Toward this end the Governor of the Zone proposed to enlist Panamanians to serve as Canal Zone policemen, positions that had previously been denied to foreign nationals. This augmentation plan was discussed in advance with union representatives at a special meeting, held on February 4, 1964, and conducted at the Governor's direction by the Lieutenant Governor and the Personnel Director. Among the labor leaders summoned to the meeting was appellant, Richard Meehan, then President of the Canal Zone Police Lodge 1798, American Federation of Government Employees (AFGE), as well as a private on the police force.[1] Two other representatives of that lodge and the president of the Metal Trades Council were also present. They were informed of the general terms of the Governor's proposal, and admonished to avoid press disclosure of what they had learned, and to confine any protests to regular channels. As the Personnel Director set forth in a file memorandum subsequently prepared:

> During the meeting the union representatives expressed strong opposition to a proposal for the inclusion of a number of non-United States citizens in the staffing augmentation plan, stating that the [Union] would use all possible means available to them at the Washington level to prevent the employment of non-United States citizens as Canal Zone policemen. I cautioned the union representatives to keep their opposition in regular channels, including appeals to the Congress, and particularly to avoid local issuance of comments or statements which could be used by the Panamanian press to inflame further the current difficulties between the United States and Panama. I, further, stated emphatically that the union group should take every precaution to avoid being quoted in the Panamanian press on this issue. The Lieutenant Governor spoke further on this point requesting that all possible care be taken to present any opposition to the employment plan through regular channels including protests or appeals to the Congress.[2]

Later the same day appellant was sought out, while he was on duty, by representatives of the Associated Press

---

1. The Union's Constitution required that police union officers be police officers as well.

2. The quoted statement is a memorandum, addressed to the "record", prepared on February 15.

and the New York Times and asked for his opinions about the Governor's augmentation plan and the hiring of Panamanian nationals. Appellant agreed to and did talk to them the next morning, February 5, 1964.

We interject to note appellant's position on the granting of this interview.

(1) He insists that whatever "cautioning" he received at the meeting was a "request" and did not amount to an "order" that he can be disciplined for having violated.

(2) His further position is that the Governor's "request" implicitly rested on mutuality of agreement to avoid local issuance to the press. He testified that he did not feel bound to silence because he assumed that the Governor was the source of the press' apparent knowledge of the Governor's plan and that any admonition was dissipated by management's own failure to observe the secrecy it had requested.[3]

(3) He also testified that he understood the meeting to be directed against release of comments to the local (Canal Zone) press.

The February 5 interview resulted within a couple of days in news stories both on the Continent and in the Zone, presenting the opinions of both the Governor and "Richard D. Meehan, Pres-

ident of Canal Zone Police Lodge 1798."[4]

On February 12, 1964, appellant expressed his opposition to the Governor's proposal by another, less refined means. During the preceding few days, appellant had arranged for the printing in large quantity of an anonymous letter, a poem signed by one Payne, and an excerpt from the Congressional Record.[5] The poem contained a burning attack on the Governor and his policies. The letter, intended and used to transmit the poem, was addressed to "Dear Friends," and urged the reader to write his Congressman and protest the proposed augmentation plan.[6]

Appellant has consistently asserted that these documents were union publications. The agency found, after hearing, that when appellant arranged their printing, he was acting without union authority and as an individual.[7]

On February 12, while attending to other union business during off-duty hours, appellant began distribution of the letter and poem, by delivering a copy of each document to each of two policemen at the police station.[8] The distribution ceased when, apparently due to some confusion, appellant left for another meeting without taking the rest of the documents he brought with him. When he returned to reclaim them and learned they had been sequestered he

---

3. Meehan expressed his assumption that the obligations were mutual by saying, *inter alia,* that " * * * [i]f they were not, we [the Union] would definitely be at a disadvantage. It showed bad faith on their part." Agency Tr. 59.

4. The news stories are reproduced in part at J.A. 21, 23. At the hearing appellant contended that these stories were the result of a conversation he had on February 6, 1964, with a local friend and newspaperman, after the Governor had offered the augmentation plan to the public on local television and after the wire services carried the information given at the February 5 interview.

5. The transmittal of Congressman Flood's speech from the Congressional Record has not been the basis for any disciplinary proceedings.

6. Appellant based the letter on a model prepared by another, making some changes, and refusing to make changes suggested by the Union's counsel.

7. J.A. 80–81.

8. J.A. 79. Appellant also left 85 copies of the letter and poem in the police booth at the entrance to the Administration Building next to copies of the Spillway, a Canal Zone house organ. The booth was not used by the general public but was visited by a limited number of people who picked up newspapers there. The agency hearing officer found that the evidence did not sustain the specification that appellant left these documents in the booth with intention that they be distributed to the general public. *Ibid.*

called for their return as union property, accepting responsibility for their distribution. Subsequently, copies of the letter and poem appeared elsewhere, but appellant has not been affirmatively connected with their appearance.[9]

On February 20, 1964, appellant was notified that he would be discharged on three charges: [10]

Charge 1, for "conduct unbecoming a Police Officer of the Canal Zone Government," related to the publication and distribution of the letter and poem. Specification "a" alleged that these documents contained "derogatory and libelous statements" about the Governor and that they "broadly, vaguely, and intemperately * * * in a sarcastic and contemptuous manner" criticized the Governor and the Executive Branch of the United States Government and their policies. Specification "b" alleged, inter alia, that appellant left 85 copies in the police booth with the intention thereby of making public distribution—an allegation denied by appellant and found not proven (see note 8 supra).

Charge 2, "failure to obey instructions from your superiors," charged that the cautioning at the February 4 meeting constituted "explicit instructions" not to discuss the personnel augmentation plan and that appellant's February 5 interview, inter alia, constituted a failure to obey instructions.

Charge 3 was for "failure to obtain clearance from the office of the Governor before releasing for publication articles pertaining to Government activities in the Canal Zone." It was based on the alleged violation of Canal Zone Government Executive Regulation No. 67 (1963), which forbade the publication of articles pertaining to Government activities in the Canal Zone without prior approval of their contents by the Governor.[11] The newspaper interview, inter alia, was alleged to have been given in violation of this regulation.

Appellant contested his discharge. Pursuant to Canal Zone regulation[12] a hearing was held March 23–24, 1964, before an agency examiner, who on April 10, concluded that charges 1(a), 2, and 3 had been sustained and that the discharge was warranted. On April 15, appellant was informed he was to be discharged effective April 16, for the reasons stated in the original charges as found by the hearing examiner. Meehan's appeal from this discharge was denied May 6, 1964, by the Governor, who found that the "charges against you are fully supported by the evidence and warranted your discharge from the service."

Exercising his rights as a Veteran's Preference Employee, Meehan appealed to the Civil Service Commission where further evidence was taken on June 19, 1964, before the Appeals Examining Office. That office sustained the discharge in its decision of September 3, 1964, which concluded that, with certain exceptions, the facts were as found by the agency, and that no change should be made in the agency's personnel action. That decision was affirmed February 8, 1965, by the Board of Appeals and Review, in the final action of the Civil Service Commission. One year later appellant, having received the support of the AFGE, filed his complaint seeking a declaratory judgment and a

---

9. J.A. 79. The record indicates that 5,000 copies of these documents were caused to be printed and Meehan did not keep close account of them. Agency Tr. 94–96. The letter and poem were reproduced in the Congressional Record by Congressman Flood on February 27, 1964. 110 CONG.REC. 3918–19. Reference to the existence of these documents was made on February 16, 1964, in the Panama newspapers. J.A. 26.

10. J.A. 17–21. The notice was in apparent conformity with Canal Zone Government Executive Regulation No. 70 (1962), which defined the procedure governing adverse personnel action. Sections 2.1–2.2 relate specifically to the requisite notice.

11. The regulation is set forth below in Part VIII.

12. Canal Zone Government Executive Regulation No. 70 (1962).

mandatory injunction to remedy his allegedly illegal discharge.

On this appeal from the summary judgment dismissing his complaint we consider and reject the broad objections lodged by appellant against the disciplinary proceeding on grounds that his activities were sheltered by Executive Order 10988, and his right to petition to Congress. We conclude the agency was warranted in finding that Charge 1 had been sustained. However, we think the record does not contain adequate support for conclusions that appellant can be discharged for the violations set forth in Charges 2 and 3. We remand to the District Court for the framing of an order to allow the agency to reconsider appellant's discharge in the light of these rulings.

## II RIGHTS OF FEDERAL EMPLOYEES DERIVING FROM UNION MEMBERSHIP

Appellant claims an immunity from discharge on the basis of Executive Order 10988.[13]

We need not consider whether there is merit in his attacks on the agency's conclusion that at all relevant times he was acting as an individual and not as a union officer.[14] Nor need we consider his contention that his case may be distinguished from those holding that Executive Order 10988 does not create any judicially cognizable rights.[15]

It suffices in the present case to point out that Executive Order 10988, by its clear language, has no application to appellant's activities. The pertinent provision, entitled "Employee-Management Cooperation in the Federal Service" reads as follows:

Section 1(a) Employees of the Federal Government shall have, and shall be protected in the exercise of, the right, freely and without fear of penalty or reprisal, * * * to participat[e] in the management of the organization and acting for the organization in the capacity of an organization representative, including *presentation of its views to officials of the executive branch, the Congress or other appropriate authority.* [Emphasis supplied.]

The regulation by its terms provides for presentations within official channels, and establishes no special warrant for appeals to the public.

Nor is the scope of Executive Order 10988 expanded by the implementing regulations promulgated for the Canal Zone.[16]

## III CLAIM THAT APPELLANT'S ACTIVITIES WERE ONLY A PETITION TO CONGRESS.

Appellant also claims that the preparation and publication of the letter and poem cannot be a ground for valid discharge because these documents were petitions to Congress within the mean-

13. 27 Fed.Reg. 551 (Jan. 19), 1962 U.S. CODE CONG. & AD.N. 4269 (1962).

14. Appellant attacks this conclusion of the agency hearing examiner as arbitrary and capricious. Eustace v. Day, 114 U.S.App. D.C. 242, 314 F.2d 247 (1962) (per curiam); Hargett v. Summerfield, 100 U.S.App.D.C. 85, 243 F.2d 29, cert. denied, 353 U.S. 970, 77 S.Ct. 1060, 1 L.Ed. 2d 1137 (1957); Carter v. Forrestal, 85 U.S.App.D.C. 53, 175 F.2d 364, cert. denied, 338 U.S. 832, 70 S.Ct. 47, 94 L.Ed. 507 (1949). The Examiner noted that the Union rules required authorizations for the expenditure of money and that Meehan did not have such authority when he directed the publication of the documents.

15. Manhattan-Bronx Postal Union v. Gronouski, 121 U.S.App.D.C. 321, 350 F.2d 451 (1965), cert. denied, 382 U.S. 978, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966); National Assn. of Internal Revenue Employees v. Dillon, 123 U.S.App.D.C. 58, 356 F.2d 811 (1966) (per curiam); Morris v. Steele, 253 F.Supp. 769 (D.Mass. 1966).

16. These regulations merely provide that agency management is prohibited from: "(a) Interfering with, restraining or coercing any employee in the exercise of the rights assured by Executive Order No. 10988, including those set forth in section 1 of the Order. * * *" Standards of Conduct for Employee Organizations and Code of Fair Labor Practices, Pt. B, § 3.2(a) (1) (Draft).

ing of 5 U.S.C. § 7102 (1964 Supp. II).[17] *Cf.* Swaaley v. United States, 376 F.2d 857 (Ct.Cl. 1967).

This case is wholly different from Steck v. Connally, 199 F.Supp. 104 (D.D.C. 1961), where the court held that § 7102 prohibited the discharge of an employee who went directly to Congress with his grievance. We do not think the right of Federal employees to petition to Congress embraces a right to launch a broad public appeal to induce their friends and sympathizers to write to their Congressmen. Compare Swaaley v. United States, 376 F.2d 857 (Ct.Cl. 1967); NLRB v. Local Union No. 1229, International Brotherhood of Electrical Workers, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953).

## IV ISSUE WHETHER AGENCY INVOKED REQUISITE STANDARD OF EFFICIENCY OF THE SERVICE.

Since appellant has status as a Veteran's Preference Eligible, he cannot legally be discharged except for such cause as promotes the efficiency of the service. 5 U.S.C. § 7512 (1964 Supp. II). Regulations of the Civil Service Commission have sketchily elaborated on the type of conduct that constitutes such cause, but these regulations do not cover appellant's conduct specifically and they conclude with the general ground of "any * * * other disqualification which makes an individual unfit for the service." [18]

There is decisional law approving agency determinations that an employee's discharge will promote the service's efficiency. Although there are some exceptions,[19] in general the courts defer to the agency as the appropriate judge of what is an appropriate cause for discharge as needed to promote efficiency of the service, provided its decision is not arbitrary or capricious.[20]

The Appeals Examining Office held that since the charges against appellant had been proved the discharge was for such cause as would promote the efficiency of the service. That appellant's discharge on the grounds set forth in the charges would promote the efficiency of the service has been the agency's consistent position in its briefs before all administrative tribunals and in court. Appellant, however, in reply brief and on argument, builds on the fact that the

---

17. It is unnecessary to consider whether appellant has been deprived of any right to petition under the First Amendment since, at least to the extent that the target of an employee's petition is Congress, the statutory immunity is, under the facts of this case, no less great then that afforded by the Constitution.

18. 5 C.F.R. § 731.201 (so-called Suitability Disqualifications) made applicable to adverse actions by 5 C.F.R. § 752.104 on January 16, 1964, 29 Fed.Reg. 429. Prior to January 16, 1964, the applicable regulations merely mouthed the statute. In September 1966 Canal Zone employees were singled out and made subject to special regulations which took account of "the nature of the Canal Zone enterprise, its geographical location, and the political status of the United States in the Canal Zone. * * *" Canal Zone Regulations, 31 Fed.Reg. 12202, at 12347, 35 C.F.R. § 255.735–1(b).

19. *See* Pelicone v. Hodges, 116 U.S.App. D.C. 32, 320 F.2d 754 (1963).

20. *E. g.*, Studemeyer v. Macy, 116 U.S.App. D.C. 120, 321 F.2d 386, cert. denied, 375

U.S. 934, 84 S.Ct. 337, 11 L.Ed.2d 265 (1963) (insubordination); Leonard v. Douglas, 116 U.S.App.D.C. 136, 321 F. 2d 749 (1963) (philosophical incompatibility at the policy making level); Dew v. Halaby, 115 U.S.App.D.C. 171, 317 F. 2d 582 (1963), cert. granted, 376 U.S. 904 (1964), writ of certiorari dismissed after the Government reinstated the employee and granted him back pay, 379 U.S. 951 (1964) (criminal accusations without convictions). Carter v. Forrestal, 85 U.S.App.D.C. 53, 175 F.2d 364, cert. denied, 338 U.S. 832, 70 S.Ct. 47, 94 L. Ed. 507 (1949); Taylor v. Macy, 252 F. Supp. 1021 (S.D.Calif.1966) (criminal convictions that had been expunged). *See* Note, 66 COLUM.L.REV. 719, 722–24 (1966). And the agency is not required to consider the employee's entire performance record in applying the standard. DeFino v. McNamara, 109 U.S.App.D.C. 300, 287 F.2d 339, cert. denied, 366 U.S. 976, 81 S.Ct. 1947, 6 L.Ed.2d 1265 (1961). And the agency is not required to defer to the employee's generally satisfactory performance record in applying the standard.

initial charges filed against him did not contain the express assertion that his proposed discharge would promote the efficiency of the service, and claims that the subsequent expression of this assertion is tantamount to a new and distinct charge without support in the prior proceedings.[21]

This contention of appellant seeks to exalt form above substance. The efficiency of the service is the standard for judging an employee's tenure that the agency is obliged by the Veteran's Preference Act to apply. That standard was invoked by the Civil Service Commission expressly and by the agency as a matter of fair implication.

In DeBusk v. United States, 132 Ct.Cl. 790 (1955), cert. denied, 350 U.S. 988, 76 S.Ct. 474, 100 L.Ed. 854 (1956), the discharge was upheld although neither the agency's charges nor the decision of the Civil Service Commission specifically stated that the plaintiff's removal was for a cause that "will promote the efficiency of the service." The court explained:

> However, all three of these documents [notice of charges, opinion of the Appeals Examiner, and letter from the Board of Appeals] referred to section 14 of the Veteran's Preference Act of 1944 [setting forth the cause standard]. * * * It is natural to conclude that these men would not have cited this statute without having in mind the standard of adjudication set out therein. From the circumstances of this case it appears that the administrative officials did in fact invoke the proper standard, and the mere absence of an express invocation of

the statutory standard cannot, under such circumstances, have an effect on the validity of an otherwise valid personnel action.

132 Ct.Cl. at 794. In Blackmon v. Lee, 92 U.S.App.D.C. 268, 205 F.2d 13 (1953), although the decision of removal did not include an explicit finding that the discharge would be for adequate cause, the discharge was upheld, *inter alia,* on the ground that the letter of charges made a reference to section 14 of the Veteran's Preference Act.

■ In the case at bar, although the agency did not refer to section 14, the agency proceedings were expressly pursuant to Canal Zone Executive Regulation No. 70 (1962). This regulation then provided specifically in § 1.2(a): "Adverse action against an employee shall not be taken except for such cause as will promote the efficiency of the service. * * * *" Plainly what was intended was the same standard as that contained in the Veteran's Preference Act and the Civil Service Act.[22] The agency action may not be fairly vitiated on the ground that it failed to invoke and apply the correct standard in considering appellant's case. Cf. Blackmon v. Lee, supra; DeBusk v. United States, *supra.*

V FREEDOM OF SPEECH ISSUES.

Appellant contends his discharge violates his assured freedom of speech,[23] since it was based on opinions on public affairs and officials protected by New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny.[24] This claim was rejected

---

**21.** Reliance is misplaced on Pelicone v. Hodges, 116 U.S.App.D.C. 32, 35, 320 F. 2d 754, 757 (1963). In that case the ground urged in court to sustain the discharge was different from that relied on at the administrative level.

**22.** This conclusion is reinforced by § 1.4 of Canal Zone Executive Regulation No. 70 (1962) wherein Veteran's Preference Eligibles are brought within the coverage of the procedures set forth therein.

**23.** It is unnecessary to consider whether the First Amendment restricts governmental action in the Canal Zone since 1 CANAL ZONE CODE § 31(3), 76A Stat. 2 (1962) extends the free speech guarantee and "the body of law developed under the First Amendment" to that area. Brief of Appellees 21–22 n. 17.

**24.** Most especially, Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). *Cf.* Bond v.

at the administrative level, the Appeals Examining Officer invoking Justice Holmes' oft-quoted ruling in Massachusetts: "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." [25]

Courts are increasingly re-examining and considering the issue whether and to what extent the Government's prerogative to employ or discharge permits it to regulate conduct of its employees that would, in the absence of the employment relationship, be protected from interference by the First Amendment.[26] As Government services multiply, the liberties of Government employees come to be the liberties of an increasing and substantial portion of the citizenry, and are accordingly given increased recognition.[27] There is a reverse side to the coin: With mounting provision of increased and increasingly indispensable services rendered by Government employees, the public weal demands administration that is effective and disciplined, and not beset by turmoil and anarchy.

■■■■ We do not approve the apparent premise of the Appeals Examining Office that an employee of the Government cannot claim the right to both a Government job and freedom of speech. One who enters the routine service of the Government[28] cannot be forced to cede all of his protections from Governmental excesses. Whatever liberties a private employer might have or take, the Government cannot disregard the Bill of Rights merely by calling on its prerogative to hire and fire employees. The Constitutional climate of today is different from that of 1892 when Justice Holmes struck off his oft-quoted phrase.

■■■■ Government employees do, to some extent, have "lesser rights" than others have under the Constitution, since they may be required to suspend or refrain from certain activities (e. g., political campaigning) that are embraced within the constitutional rights of others, when such activities are reasonably deemed inconsistent with their public status and duties. See United Public Workers, etc. v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). But in some aspects, at least, their constitutional rights are inviolable notwithstanding their status as Government employees.

Recently, in Garrity v. State of New Jersey, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967), the Supreme Court held that certain constitutional rights were retained by policemen, stating: "There are rights of constitutional stature whose exercise a State may not condition by the exaction of a price." Assertion of First Amendment rights

Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed. 2d 235 (1966). See Swaaley v. United States, 376 F.2d 857 (Ct.Cl.1967); Turner v. Kennedy, 118 U.S.App.D.C. 104, 332 F.2d 304 (dissenting opinion), cert. denied, 379 U.S. 901, 85 S.Ct. 189, 13 L.Ed.2d 175 (1964); Watts v. Seward School Bd., 421 P.2d 586, 610 (Alaska 1966) (dissenting opinion), cert. granted, 389 U.S. 818, 88 S.Ct. 84, 19 L.Ed.2d 68 (1967); Bagley v. Washington Twp. Hosp. Dist., 65 Cal.2d 499, 55 Cal.Rptr. 401, 421 P.2d 409 (1966) (in bank); Fort v. Civil Service Com., 61 Cal.2d 331, 38 Cal.Rptr. 625, 392 P.2d 385 (1964); Pickering v. Board of Educ., 36 Ill.2d 568, 225 N.E.2d 1, 7 (dissenting opinion), probable jurisdiction noted, 389 U.S. 925, 88 S.Ct. 291, 19 L.Ed.2d 276 (1967).

25. J.A. 81, 102–103. The language of Justice Holmes appears in McAuliffe v. City of New Bedford, 155 Mass. 216, 220, 29 N.E. 517 (1892).

26. See, e. g., United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Keyishian v. Board of Regents, 385 U.S. 589, 605–606, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Garrity v. State of New Jersey, 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); and cases cited in note 24, supra.

27. Bagley v. Washington Twp. Hosp. Dist., supra note 24, 55 Cal.Rptr. at 409, 421 P.2d at 417. See Creech, The Privacy of Government Employees, 31 LAW & CON-TEMP.PROB. 413 (1966).

28. Compare Leonard v. Douglas, 116 U.S. App.D.C. 136, 321 F.2d 749 (1963).

was mentioned specifically as sharing this constitutional rank.[29]

 On the other hand we do not agree with appellant that an employee may, without fear of discipline, say anything and anywhere whatever a private person may say without fear of a libel action, under the doctrine of *New York Times*. The added interests of the sovereign as employer are factors to be considered in adjusting and balancing constitutional concerns.

In Swaaley v. United States, 376 F.2d 857 (1967), the Court of Claims held that some aspects of New York Times Co. v. Sullivan have rightful application as restrictions on the Government's employer prerogatives. However, Swaaley's "offense" consisted only of reporting, to his ultimate superior certain suspected (but, it developed, unfounded) improprieties of his immediate superiors. The standard used by *New York Times* for defining the statements that are non-actionable when made by a private citizen was held by the court to define the statements of a Government employee that are protected when made in channels encompassed by the Constitutional right to petition.[30]

 Free and open discussion within an agency of Government is different from heated debate flowing into the public arena. While a free society values robust, vigorous and essentially uninhibited public speech by citizens, when such uninhibited public speech by Government employees produces intolerable disharmony, inefficiency, dissension and even chaos, it may be subject to reasonable limitations, at least concerning matters relating to the duties, discretion, and judgment entrusted to the employee involved.[31] There is a reasonable difference between the kind of discipline and limitation on speech the Government may impose on its employees and the kind it may impose on the public at large. To ensure a basic efficiency in public service a limitation may be imposed as a condition of Government employment that is broader than the standard that defines the wrongdoing that subjects a private citizen to penalty or damage action.

 In our view appellant's conduct in printing and beginning distribution of the letter and poem was a legitimate basis for discharge to promote the efficiency of the service. These documents, especially the poem, were intemperate and sarcastic, a contemptuous and defamatory lampoon of the Governor and his policies. This invective by a policeman, charged under the circumstances with special responsibility and requirements of discipline, against the official

---

29. *See also* Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963), that the Constitution does not permit "liberties of religion and expression * * * [to] be infringed by the denial of or placing of conditions upon a benefit or privilege." *Compare* Rudder v. United States, 96 U.S.App.D.C. 329, 331, 226 F.2d 51, 53 (1955): "The District of Columbia Code provides that a tenancy from month to month may be terminated on 30 days' notice, and that a landlord may recover possession in the Municipal Court. The Code does not require that a reason for termination be given. But those propositions do not decide this case. The government as landlord is still the government. It must not act arbitrarily, for, unlike private landlords, it is subject to the requirements of due process of law. Arbitrary action is not due process."

30. *Compare* Linn v. United Plant Guard Workers, 383 U.S. 53, 65, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966).

31. *E. g.*, Eustace v. Day, 198 F.Supp. 233 (D.D.C.1961), aff'd, 114 U.S.App.D.C. 242, 314 F.2d 247 (1962) (per curiam); Levine v. Farley, 70 App.D.C. 381, 107 F.2d 186 (1939), cert. denied, 308 U.S. 622, 60 S.Ct. 377, 84 L.Ed. 519 (1940); Jenson v. Olson, 353 F.2d 825 (8th Cir. 1965); Veatch v. Resor, 266 F.Supp. 893 (D.Colo.1967); Krennrich v. United States, 340 F.2d 653, 169 Ct.Cl. 6 (Ct. Cl.), cert. denied, 382 U.S. 870, 86 S.Ct. 147, 15 L.Ed.2d 109 (1965); Houston v. United States, 297 F.2d 838, 156 Ct.Cl. 38 (Ct.Cl.) (per curiam), cert. denied, 371 U.S. 815, 83 S.Ct. 27, 9 L.Ed.2d 56 (1962); Dulcy v. United States, 284 F.2d 687 (Ct.Cl.1960). In addition, *see Bagley, Watts,* and *Pickering*, note 24 *supra.*

ranking as chief of the force, is such a flouting of elemental loyalty to his employer and their common enterprise as to provide cause for discharge, except as the employee's acts may be necessary to preserve his own protected rights.[32] Loyalty to the Government employer cannot be held to compel servility of thought and expression, but it does set a limit on channels and methods available to indicate disagreement with a superior official.

Meehan was not an ordinary civil servant but was a policeman whose sensitive duty it was in that tense and troubled time and place to execute the commands of the Governor. The fact that Meehan was also the spokesman for the police union may have increased his authority to speak in behalf of his union members when he confined his speech to appropriate channels. It also gave him a stature and commensurate responsibility, both to the union and to the employer, to confine himself to channels and to exercise temperance.

█ The Governor had the power to command Meehan not to disclose information about the augmentation plan to the newspapers under the circumstances that then prevailed. The situation in the Canal Zone was tense and official apprehension of renewed rioting was reasonable. The confidential information given to Meehan and the other employee representatives could have had an incendiary effect upon the public. The time was troubled not only because of local disorders within the Zone, but also because of their repercussions in terms of the foreign policy and diplomacy of the United States. Against this backdrop the Government clearly may make reasonable demands of secrecy which, if violated, may result in reasonable discharges for insubordination.

█ While the Government's interests invested it with broader powers to suppress or inhibit the public speech of its employees, there appears no compelling interest that relieves the Government of its obligation to define narrowly and with as much precision as feasible the speech which it proscribes. There is a particular need for clarity and specificity when Government officials are engaged in regulating speech. In the most recent reiteration of that need the Supreme Court said:

We emphasize once again that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms," N. A. A. C. P. v. Button, 371 U.S. 415, 438, [83 S.Ct. 328, 340, 9 L.Ed.2d 405;] "[f]or standards of permissible statutory vagueness are strict in the area of free expression. * * * Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." Id., at 432–433, [83 S.Ct., at 337–338.] * * * When one must guess what conduct or utterance may lose him his position, one necessarily will "steer far wider of the unlawful zone * * *." Speiser v. Randall, 357 U.S. 513, 526, [78 S. Ct. 1332, 1334, 2 L.Ed.2d 1460]. For "[t]he threat of sanctions may deter * * * almost as potently as the actual application of sanctions." N. A. A. C. P. v. Button, supra, [371 U.S.] at 433, [83 S.Ct. 338]. The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed. See Stromberg v. People of State of California, 283 U.S. 359, 369, 51 S.Ct. 532, 535, 75 L.Ed. 1117]; Cramp v. Board of Public Instruction, 368 U.S. 278, [82 S.Ct. 275, 7 L.Ed.2d 285]; Baggett v. Bullitt, [377 U.S. 360, 84 S.Ct. 1316, 12 L. Ed.2d 377].

Keyishian v. Board of Regents, 385 U.S. 589, 603–604, 87 S.Ct. 675, 684, 17 L.Ed.

---

32. *Compare* NLRB v. Washington Aluminum Co., 370 U.S. 9, 17, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); NLRB v. Local Union No. 1229, International Bhd. of Elec. Workers, 346 U.S. 464, 476–477, 74 S.Ct. 172, 98 L.Ed. 195 (1953).

2d 629 (1967).[33] Since public employees have some rights of free speech, the Government is required to be reasonably specific in notifying its employees as to utterances that are prohibited before it can make those utterances a basis for discipline.[34] Precision is all the more requisite where, as here, the conduct which has evoked retaliation occurred during off duty hours.

This discussion of general interests and standards serves as a basis for rejecting appellant's broad claims of sweeping immunity, and stands as a frame for focusing on the specific charges.

## VI THE CHARGE OF CONDUCT UNBECOMING AN OFFICER.

The first charge against appellant was "conduct unbecoming an officer" consisting of the preparation and publication of the derogatory letter and poem.

a. We begin by examining the general standard. We have secured the regulations of the Civil Service Commission, the Canal Zone Government, and the Police Department of the Canal Zone, and we are unable to locate any proscription against "conduct unbecoming an officer." There is no reference to any such regulation either in any ruling or opinion in the record or in the Government's brief.

 However, the absence of such a written regulation is not dispositive. Our research discloses that a regulation of the Canal Zone in force at the time was directed at defamatory statements concerning other officials.[35] Moreover, it is not feasible or necessary for the Government to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of employees includes "catchall" clauses prohibiting employee "misconduct," "immorality," or "conduct unbecoming." We think it is inherent in the employment relationship as a matter of common sense if not common law [36] that an employee in appellant's circumstances cannot reasonably assert a right to keep his job while at the same time he inveighs against his superiors in public with intemperate and defamatory lampoons. We believe that Meehan cannot fairly claim that discharge following an attack like that presented by this record comes as an unfair surprise or is so unexpected and uncertain as to chill his freedom to engage in appropriate speech.

b. Turning to the specific items before us we agree with the conclusion of the agency and the Commission that the items distributed by appellant were objectionable.

The poem, "In the Panama Canal Waters," is short enough to reproduce in the Appendix. This man, who "recruits foreign nationals," is identified as one who "belittles U.S. loyalty" and "refutes the wish of Congress by subterfuge and lies," etc. The poem must be read in connection with the time and place for which it was deployed. That

33. See generally Amsterdam, Note, The Void-For-Vagueness Doctrine in the Supreme Court, 109 U.PA.L.REV. 67 (1960).

34. "[P]olicemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." Garrity v. State of New Jersey, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967).

35. Canal Zone Government Executive Regulation No. 5, Enclosure 1, Offense 15 (1962), designates as impermissible employee conduct which may result in removal, "[m]aking false or unfounded statements which are slanderous or defamatory about other employees, supervisors or officials." A footnote directs the agency to "[c]onsider the duties and position of the employee, the nature of the statements made and the extent to which they damage the injured party, the nature and timing of any retraction by the employee and the extent to which the damaging statements are supported by established facts." No explanation has been offered as to why that provision and the guidelines for its execution were not the basis for the adverse action under review. We observe in passing the subsequently adopted standards of employee conduct prevailing in the Zone. 31 Fed. Reg. 12349, 35 C.F.R. §§ 255.735–35, –38, –39 (Sept. 16, 1966).

36. See authorities cited in note 31, supra.

its character as an intemperate lampoon was not lost on appellant is eloquently revealed by his testimony that he had it printed and distributed because something like this was needed to "move" people. What was written of the Governor was defamatory in character, even though the immunity rule of New York Times would have precluded a private damage action for libel in the absence of express malice.

Appellant's longer letter cannot be considered by itself because it takes on coloration from the accompanying poem.[37] Appellant meant the poem to stir up the reader enough to be receptive to the suggestion in the letter to write his congressman. They were coupled not only figuratively but literally, for appellant himself stapled them together in sets. The contemptuous quality of the letter's epithets "honorable" and "gentleman" used for the Governor, is underscored by its reference to the "loyal" acts of Edgar Harrison—a Panamanian national who had worked for the United States, but was found during the riots to be a sniper shooting against United States troops.

The record also contains proof that appellant refused to follow the advice of Samuel Roe, a past president and kind of senior adviser to the Union, who had attended the February 4 meeting, that a particularly offensive paragraph[38] be deleted.

Counsel point to statements in the Congressional Record criticizing the Governor of the Canal Zone, statements that are indeed polemical in the extreme. But it is not necessarily true that what may be said by Congressmen, who are duly elected to a coordinate branch and enjoy constitutional immunity from judicial scrutiny, may also be said in a public context by employees of the executive branch.

The fact that appellant was a union president does not establish legal immunity. Indeed it seems to us to underscore the fact that appellant's tirade against the Governor breached the limits of permissible responsibility. His statements would and did reach greater audiences and cut deeper into the employment relationship because they came from a union president. A union official is not free, as might be a routine employee, to offer as an excuse the contention he had no awareness of basic employment obligations.

What is involved here is not a matter of good taste, but of basic responsibility. We cannot upset the administrative determination that this responsibility was violated. The fact that appellant had motives that seemed to him to be in the interest of patriotism—and that he was very likely more hot-headed than evil in design—may go to the executive question of appropriate discipline. It does not justify his failure to comply with his obligation as an employee of the executive branch, an obligation intensified rather than diluted by the tense and sensitive situation of the time and place.

## VII FAILURE TO OBEY INSTRUCTIONS.

There can be no doubt that an employee may be discharged for failure to obey valid instructions, or that a discharge for insubordination will promote the efficiency of the service. The salient issue concerning the second charge is the clarity of the warnings given to appellant at the February 4, 1964, meeting.

Meehan claims that he understood the admonition to be directed against statements to the local press. The Appeals Examination Office dismissed this defense with the observation: "It is inconceivable that the appellant was so naive

---

**37.** Cf. Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372 (1918).

**38.** "We do not intend to perpetrate a personal attack on the Honorable Governor of the Canal Zone, for we are aware that he is only a Major General and in reality

only an instrument of the boys in the black strip (sic) pants in the State Department, whose major goal since the time of Alger Hiss has been to implement the policy of New Americanism and erase all opinions opposed to their policies."

as to believe that any information given to a reporter from a wire service, which was of local interest and significance, would not appear in a local paper." If we understand this correctly, it was a conclusion as to Meehan's subjective intent, which went beyond that of the Hearing Examiner who heard and observed the demeanor of appellant. Meehan had testified that this was indeed his understanding and that he scrupulously refrained from interviews with the local press.[39] The Hearing Examiner concluded that the defense was invalid because the object of the Governor was to avoid inflaming the tensions between Panama and the United States by press releases of any kind. But he did not find that appellant was reporting falsely on his subjective understanding.

This issue is not without difficulty. Naivete is one thing, insubordination another. Perhaps, indeed, it was the Personnel Director who was naive if he supposed that a complaint telegraphed by Meehan to Mr. Flood and other Congressmen, which admittedly could not be stopped, would not swiftly find its way *via* the Congressional Record, and wire service stories, into the local newspapers. When the Civil Affairs Director of the Canal Zone testified he responded to a question about the particular form of the "instruction" as follows:

> They [the Lieutenant Governor and the Personnel Director] were opposed to making a release. I don't know as there was any specific statement telling them that this is a direct order. (Agency Tr. 48)

■ Appellant was an employee representative and it was the burden of management to be reasonably precise if, and when, it sought to terminate or suspend freedom to discuss matters of critical employee or union concern in a moderate and responsible manner with the press. Moreover, appellant, as a policeman, was one in whose views the public had an interest[40] unless expression of those views was curtailed with reasonable particularity.

■ Government officials seeking to inhibit freedom of speech of Government employees have a responsibility to be reasonably specific if they intend that freedom to be inhibited by an order. Otherwise their words may reasonably be taken as a plea for cooperation. The construction that the Zone officials were using an approach rooted in cooperation and agreement rather than mandate is by no means fanciful in view of their ultimate lack of power in fact to preclude widespread publicity since channels of communication which could not be clogged were available through Congressmen.

The Hearing Examiner concluded that while this was phrased as a request, the surrounding facts show "that Mr. Meehan in being 'requested' * * * not to release information to the press * * * was in fact being 'instructed' not to do so."

■ The duty of a court to consider whether the record contains substantial evidence to support an agency's findings must not be scanted when the underlying issue is whether there was an outstanding order prohibiting speech. We believe, as already indicated, that in those tense days the Canal Zone Government had the right to curtail freedom of speech by its employees, but we think it had a correlative duty to set forth its prohibition with reasonable clarity and particularity. We do not say the prohi-

**39.** Specifically he testified that when reached by Mr. Scott Frances of the Panama-American, notwithstanding "we are close, personal friends," he told Mr. Frances that since he was a reporter of the local press Meehan could not make any release to him.

**40.** Compare the dissenting observations of Mr. Justice Schaefer in Pickering v. Board of Educ., *supra*, note 24: "Teachers are not necessarily the best critics in matters of school finance and administration, but they are in closer contact with the actual operation of the schools than anyone else and the public should not be deprived of their views." 225 N.E.2d at 10. *Compare also* Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966).

**838**

bition can never be implied from circumstances. Nor do we say that the existence of an order is always negatived by the phrasing as a request. Sometimes, in some contexts, as the Ensign said to the Admiral, "Your every wish is my command."

■ However, the evidence before us does not ring out with requisite clarity. Even in his memorandum written 11 days after the meeting, 8 days after the news stories, and 3 days after appellant had already started distributing the intemperate poem and letter, the Personnel Director wrote it up softly, that he *"cautioned* the Union representatives to keep their opposition in regular channels * * * [and] to *avoid* local issuance of comments or statements which could be used by the Panamanian press * * * [and] should *take every precaution to avoid* being quoted in the Panamanian press on this issue." [Emphasis supplied.]

VIII FAILURE TO OBTAIN CLEARANCE.

The final charge stemmed from a violation of Canal Zone Government Executive Regulation No. 67, Part V, § 5 (1963), which provided at the pertinent time:

> *Permission to publish articles.* Employees shall obtain clearance from the office of the Governor before releasing for publication articles pertaining to Government activities in the Canal Zone. The purposes of the policy are: To guard against improper use of official information obtained in the course of employment and affecting interests of the Government; to minimize the publishing of inaccurate information concerning activities and policies of the Canal agencies; and to avoid leading anyone to believe that information published by an employee has official sanction when such writing represents only an employee's personal views.

■ The agency's examiner and the Commission's Examining Office both concluded that the regulation was valid and that appellant had violated it by holding the February 5 interview and by supervising the publication of the poem and letter. Ordinarily the courts will accept the interpretation an agency gives to its own regulations.[41] However, when a disciplinary proceeding involves an issue of fair warning, additional considerations are involved.

■ What notice was given to this employee by this regulation? It sets forth the need for clearance before an employee may "publish articles."[42] A central purpose is stated as that of obviating misunderstanding, avoiding the possibility that a reader will take the employee's views as those of the Zone. Looking at the regulation alone, both text and context, there is at least a doubt whether it may fairly be taken as prohibiting an oral interview by an employee representative taking issue with a management decision.

■ The agency's practice is also important, of course. It may in some instances supply a warning not given by the text of the regulation as such. Here, however, appellant calls to our attention the interpretation of the clearance regulation (Executive Reg. 67), which the agency made in the related discharge proceeding involving the author of the poem, Mr. A. C. Payne. In Payne's case, the hearing examiner declared that agency employees had long engaged in the practice of submitting opinions for publication to the local newspapers without any record of adverse consequences. "[T]he writing of remarks against the Government in the columns of the Panama papers was considered fair tactics, and would not subject any employee to any penalties." On the record, Executive Regulation 67 may have lapsed for desuetude in the absence of some notice re-

---

41. 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 30.10 (1958).

42. At the inception of the hearing in the agency, appellant argued that his statements were not "articles" that had to receive clearance and that if they were held to be, the regulation would be in contravention to the Constitution. (Agency Tr. 2–3.)

instating its potency.[43] We think that appellant has raised sufficient unrebutted doubts about the scope and applicability of it to prevent its use as an effective basis for penalizing his conduct.[44]

## IX REMAND.

■ The second and third of the three charges cannot support the discharge. It does not inexorably follow that the discharge itself was contrary to law. However, it is unclear whether the three charges were deemed by the agency and the Civil Service Commission to constitute separate or cumulative grounds [45] for discharge. We cannot treat the errors as harmless since we don't know that a finding on Charge 1 alone would have resulted in a discharge [46]—especially in light of the spectrum of punishments the agency could have imposed [47] for conduct which, as already indicated, is not altogether void of Constitutional protection. The cause is remanded to the District Court for the framing of an order retaining jurisdiction pending further consideration by the Canal Zone Government and the Civil Service Commission.[48]

So ordered.

---

43. Whatever disabilities the executive branch may have to abrogate the effect of a valid legislative enactment by long-standing non-enforcement, *see* 1 J. SUTHERLAND, STATUTORY CONSTRUCTION § 2034, at 510–13 (3d ed. Horack 1943), we are confident that an agency does not have untrammeled freedom to promote regulations; to acquiesce in, if not induce, their violation by desuetude; and then come crashing down on the "offender" with a discharge from employment. *See* Monahan v. United States, 354 F.2d 306, 173 Ct.Cl. 734 (1965) (by implication).

44. In light of our conclusion that charge 3 cannot stand, we need not consider whether or to what extent the "prior clearance" regulation may suffer from either over-breadth, *cf.* United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.

## APPENDIX

**In the Panama Canal Waters**
**by A. C. Payne**

Someone rocks the hull
Of our U.S. Constitution,
He grabs it by the gunwales
In a foreign revolution.

He dampens Civic powder,
Muzzles Union guns,
Recruits the foreign nationals,
Rejects the native sons.

Refutes the wish of Congress
By subterfuge and lies,
Twists knives of propaganda
While factual heartbeat dies.

He belittles U.S. loyalty,
He scorns U.S. tradition,
And if we dare participate
He brands it as sedition.

He stills militia's muskets,
Condemns them to the walls,
All U.S. looks on aghast
As every statute falls.

But we're saddled with him.
He struts athwart the deck,
Causing by misjudgment
The Constitution's wreck.

TAMM, Circuit Judge (dissenting in part):

I dissent from those sections of the majority opinion which hold that the

---

Ed.2d 508 (1967); or must be accomplished by procedures permitting prompt determination of application for clearance, *cf.* Teitel Film Corp. v. Cusack, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d —— (1968) (per curiam).

45. *See* Pelicone v. Hodges, 116 U.S.App. D.C. 32, 320 F.2d 754 (1963); Greenway v. United States, 175 Ct.Cl. 350, cert. denied, 385 U.S. 881, 87 S.Ct. 167, 17 L.Ed. 2d 108 (1966).

46. *Cf.* Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 411–15, 379 F.2d 453, 465–69 (1967).

47. *See* Canal Zone Government Executive Regulation No. 5 (1962). Particularly relevant is Enclosure 1, "Schedule of Disciplinary Offenses and Penalties."

48. *See* VanBourg v. Nitze, 128 U.S.App. D.C. ——, 388 F.2d 557 (1967).

second and third charges do not support appellant's discharge. I would therefore affirm the District Court.

The scope of judicial review in a case of this type is an exceedingly narrow one. McTiernan v. Gronouski, 337 F.2d 31, 34 (2nd Cir.1964). If the agency's decision is not arbitrary or capricious, that is where the agency's findings are "supported by evidence," Pelicone v. Hodges, 116 U.S.App.D.C. 32, 33, 320 F.2d 754, 755 (1963), or stated otherwise, where "there is a rational basis for the [agency's] conclusions * * *," Eustace v. Day, 114 U.S.App.D.C. 242, 314 F.2d 247 (1962), we have held that the agency's action must be upheld. Although "[t]here may be ground for reasonable differences of opinion * * *" on the factual issues, Studemeyer v. Macy, 116 U.S.App.D.C. 120, 121, 321 F.2d 386, 387, cert. denied, 375 U.S. 934, 84 S.Ct. 337, 11 L.Ed.2d 265 (1963), a court will not disturb the agency decision if it is supported by substantial evidence. The record before us, I am convinced, contains more than ample evidence to support the findings of the Hearing Examiner who first heard the charges against appellant. Appellant's appeal to the Appeals Examining Office resulted, after a detailed review of the evidence, in the upholding of the findings of the trial examiner. Thereafter an appeal to the Board of Appeals and Review of the Civil Service Commission resulted again in an affirmation of the decision against appellant. Finally a careful and experienced District Court Judge, with a full and complete record of all of the facts and evidence before her, concluded that this evidence justified the action against appellant. Upon this record, then, I would affirm the action of the District Court.